436 So.2d 456 (1983)
STATE of Louisiana
v.
Scott LINGLE.
No. 82-KK-2864.
Supreme Court of Louisiana.
June 27, 1983.
Rehearing Denied September 1, 1983.
*457 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., E. Sue Bernie, Kendall Green, Leon A. Cannizzaro, John Craft, Asst. Dist. Attys., for relator.
Robert Glass, New Orleans, for respondents.
LEMMON, Justice.[*]
We granted the state's application for certiorari (previously denied by a divided court of appeal) in order to review the trial court's suppression of evidence seized in the search of defendant's residence pursuant to a warrant. 425 So.2d 769. We now reverse the pretrial ruling and overrule defendant's motion to suppress.
Mrs. Janet McLeod, a 62-year old live-in housekeeper who was a friend of defendant's grandmother, Mrs. Philomene Cusachs, was found stabbed to death in her residence on March 13, 1982 at 6:10 p.m. During the investigation that evening, Officer Farrar determined that Mike Rautis, who lived across the street from the victim, had seen a white car drop off a young man in front of the victim's home earlier that afternoon and had observed the man knock at the side and rear doors before he lost sight of the young man in the rear yard.
Further investigation led officers to seek information from defendant, who lived with his grandmother. When the officers went to defendant's home on March 15, Mrs. Cusachs expressed a preference that any questioning be conducted in the presence of an attorney. The officers honored her request and left. Outside the residence, the officers encountered a group of young men and questioned them about defendant. One of the young men, Steven Calogero, informed the officers that defendant had admitted being at the victim's home near the time of the murder. Officer Farrar went to the house of one of the young men to question them further, while Officer Bonura returned to headquarters. Farrar telephoned the information obtained in the interview to Bonura, who promptly utilized this information, along with previously obtained information, to prepare an affidavit in support of an application for a warrant to search defendant's residence for evidence of the recent crime.
In his affidavit, Officer Bonura stated that defendant told Calogero he "was at the scene of the murder on the day of the murder and at the time of the murder" and "was at the house knocking on the front and rear doors when McLeod was killed".[1] *458 He further stated that Mrs. Cusachs had a telephone conversation with the victim "at about 5:15 P.M.", that the victim had to hang up because someone was knocking at the door, and that a neighbor across the street "at that same time" saw a young man fitting defendant's description knock at the rear carport door and the side door before returning to the rear of the house, where he went out of sight. Additionally, the affidavit stated that defendant, in his statement to Calogero, admitted entering the house, finding and turning over the body, hearing an invalid lady ring a bell for assistance, knocking over a ceramic cat, running out of the door, and being scratched on the arm while jumping fences.
The magistrate immediately issued a warrant to search defendant's residence for the purpose of seizing any blood stained clothing, any property taken from the victim's residence, and any prescription bottles with the names of the victim or the other two ladies who occupied the residence. The police executed the warrant the same evening and seized a shirt, pants, socks, tennis shoes and a cooking utensil with pills. Defendant moved to suppress the seized items.
At the hearing on the motion to suppress, defense counsel focused on developing inconsistencies between the facts gathered by the officers in the investigation and the facts stated in Officer Bonura's affidavit. Officer Farrar admitted his notes reflected that Calogero had told him that defendant said "he was probably at the house at the front or rear door when the crime was going on" and not that defendant had explicitly stated he "was at the scene of the murder on the day of the murder and at the time of the murder", as reported in the affidavit. (Emphasis supplied) Another "inconsistency" involved Officer Farrar's notes of the neighbors' interviews, which reflected that Rautis had seen the young man at the victim's door between "5:00 and 5:30 p.m., maybe later". In composing the affidavit from Officer Farrar's telephone information and from Officer Farrar's notes taken at the interviews with the neighbors, Officer Bonura alleged that a neighbor (who was incorrectly identified by the name of a different neighbor) saw the young man in the victim's yard "at that same time" as the telephone conversation between the victim and the defendant's *459 grandmother, which allegedly occurred "at about 5:15". Defense counsel, in order to refute the time of the telephone conversation stated in the affidavit, presented Mrs. Cusachs, who testified that she told the police she had placed the telephone call to the victim at "just maybe a few minutes after five," but that the call was not "closer to 5:15 than 5:00." Finally, Officer Farrar admitted that his notes indicated defendant had told Calogero that he left his grandmother's home (two or three miles from the victim's home) while his grandmother was still talking on the telephone to the victim, but that this information was omitted from the affidavit.
After the hearing on the motion to suppress, the trial judge concluded that the affidavit contained several misrepresentations of fact. However, the judge assumed (without specifically deciding) that the misrepresentations were made unintentionally and in good faith, and he "retested" the remainder of the affidavit (with the misrepresentations excised). See State v. Rey, 351 So.2d 489 (La.1977). Although the judge noted that the "police were totally justified in their suspicion of the defendant in connection with this crime", he concluded that the "suspicion should have only motivated the officers to seek additional facts to include within a search warrant". He further concluded that the retested affidavit (and probably the original affidavit) failed to establish probable cause for the search of Lingle's residence, and he accordingly suppressed the evidence.
In this court, the prosecutor argues that the affidavit, before and after reconstruction by addition of the omissions and deletion of the inaccurate conclusory statements, established probable cause for the search. See State v. Lehnen, 403 So.2d 683 (La.1981).
Since the trial judge did not explicitly find that the police acted with an intent to deceive the magistrate, the judge correctly "retested" the affidavit, after the inclusion of the "omitted" fact that defendant was at home when Mrs. Cusachs was speaking to the victim on the telephone and after the revisions to adjust the conclusory "misstatements". State v. Ogden, 391 So.2d 434 (La. 1980). However, we disagree with the trial judge's legal conclusion that the reconstructed affidavit failed to establish a reasonable basis for the magistrate to authorize the invasion of defendant's privacy interest in his home for the purpose of discovering bloody clothing and other items (for example, prescription bottles) which would associate defendant with the recent crime and might establish a motive for the seemingly senseless murder.[2]
The officers were acting in the haste of a criminal investigation, with one policeman telephoning recently obtained information to his fellow officer, who was at the station endeavoring to structure the facts drawn from various sources into a coherent sworn statement for presentation to a magistrate. Whenever information of this rather complex nature is translated through various persons, some modifications, conclusory statements, and inaccuracies are likely to occur.[3] A typical example of this was the *460 inaccuracy regarding the name of the neighbor (Rautis, not Reuter) who saw the young man in the victim's yard. Typical also were the affiant's assertions regarding the time sequences, which are the affiant's reasonable constructions of the information, although not stated exactly as relayed to him. For example, the preciseness of affiant's statement about the time of the telephone conversation depended upon the length of the conversation, since a call initiated "a few minutes after five" may well have still been in progress "at about 5:15", which was the midpoint of the neighbor's time range estimate of his sighting the young man in the victim's yard.[4]
The inaccuracies in this case added little to the determination of probable cause. Both the original and the reconstructed affidavit convey the impression that defendant portrayed himself to his friends as an innocent visitor who happened onto the victim of a recent murder, became frightened and fled. The inaccuracies in the original affidavit do not make it appear that defendant confessed the murder to his friends, but rather relate to the fact (admitted by defendant) that defendant was at the victim's house at the time of or shortly after the crime. The inaccurate time sequence perhaps makes it appear that defendant was the person knocking on the victim's door when she terminated the telephone conversation, but the impreciseness does not detract from the admitted facts that defendant let himself inside the house, touched the body, broke the ceramic piece, fled without summoning assistance, and scratched his arm at some point during the incident.
Moreover, the "piecing together" of bits of information in order to present a logical, understandable sequence of events to a magistrate is a difficult thing to do, even for an attorney who has the benefit of training in the art of written expressions and of the quieter atmosphere of a law office. To demand of police officers the sort of preciseness of expression expected from lawyers and judges is unrealistic and is certainly not required by the Fourth Amendment. The United States Supreme Court has often noted that affidavits are "normally drafted by non-lawyers in the midst and haste of criminal investigation" and that "technical requirements of elaborate specificity ... have no proper place" in the evaluations of such documents. United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965).
Given the circumstances with which the officers were faced in this case (having just alerted defendant that he was a possible suspect in a murder case), a judge evaluating the magistrate's determination of probable cause must use a "non technical, commonsense" standard. See Illinois v. Gates, ___ U.S. ___, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); United States v. Ventresca, above. When this standard is applied to the present affidavit (with or without the correction of inaccuracies and addition of omissions), the resultant picture in our opinion establishes a sufficient factual basis to justify the magistrate's approval of an intrusion into the privacy of defendant's home to search for the described evidence, which might shed further light on his involvement. The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a "fair probability" that evidence of a crime will be found in a particular place; and the task of the reviewing court is simply to insure that the magistrate had a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, above. Moreover, the task of the reviewing court in evaluating a reconstructed affidavit is to determine whether the magistrate's conclusion as to probable cause would have been different if the affidavit had not contained the inaccuracies established at the hearing on the motion to suppress.
*461 In the present case, the issuing magistrate had substantial and uncontroverted information on which to decide that there was a "fair probability" that evidence of a crime would be found in the place to be searched. First, there was no doubt that a brutal murder had been recently committed by an unknown assailant.[5] The identification and apprehension of the offender needed to be accomplished with all possible haste. See State v. Crain, 409 So.2d 603 (La.1982); Iverson v. North Dakota, 480 F.2d 414 (8th Cir.1973). Second, Lingle was familiar with the victim's residence, had admitted his entry, and had described in vivid detail the gruesome scene of the victim's body and the "gurgling sound" of blood flowing from her neck when he turned her prostrate body. Third, someone fitting defendant's description was seen arriving at the house during the approximate time frame within which the murder occurred. Finally, and possibly most important, defendant fled the scene without alerting anyone of his discovery of the body and without coming forward to endeavor to aid authorities in apprehending the murderer of his grandmother's friend.[6] The fact that Calogero observed a scratch on defendant's arm, after defendant had fled the scene where someone had probably struggled with the victim, also adds to the establishing of probable cause.
Inasmuch as probable cause is a fluid concept which turns on the assessment of probabilities in particular factual contexts, we conclude that the issuing magistrate was presented with an affidavit which reasonably supported his independent judgment on probable cause. See Illinois v. Gates, above; State v. Patterson, 422 So.2d 1131 (La.1982). Further, even when the procedure of "retesting" the "reconstructed" affidavit is followed, we conclude that the magistrate's conclusion of probable cause to search defendant's residence would not have been different if the affidavit had not contained the inaccuracies established at the hearing on the motion to suppress.
Accordingly, the judgment of the trial court is reversed, the motion to suppress the evidence is overruled, and the case is remanded for further proceedings.
DENNIS, J., concurs with reasons.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
The trial judge correctly granted defendant's motion to suppress. The reformed affidavit did not establish probable cause.[1]
THE AFFIDAVIT
Defendant attacked the accuracy of the affidavit in two respects: the sentence stating that Lingle was present "at the time of the murder" and the sentence to the effect that Lingle told Calogero he was knocking on the doors "when McLeod was killed".
The affidavit is inaccurate as to what Lingle told Calogero. Officer Steve Farrar admitted that the notes he took at the time of his conversation with Calogero indicated Lingle "was probably at the front or rear door when the crime was being committed". (Vol. 2, p. 264; emphasis added).
The inaccuracies contained in the affidavit must be excised. State v. Rey, 351 So.2d 489 (La., 1977). Thus, the statements indicating that Lingle was at the scene when McLeod was killed must be excised before evaluating the warrant for probable cause.
*462 Defendant also established that the affidavit contained significant additions and an omission, as well as inaccuracies. The additions concern the statement that Mrs. Cusachs, Lingle's grandmother, was on the telephone at about 5:15 p.m. with the victim and the subsequent statement that "also at that same time" a neighbor, "James Reuter[2]... observed a white male fitting the description of Lingle get out a white vehicle" and disappear toward the rear of the victim's house after knocking at the side and back doors. Rantis (Reuter) thus placed Lingle at the murder scene at the same time, 5:15 p.m., the victim said someone was at the door, the strong inference being that the murderer at the door was young Lingle. Officer Farrar was frank to admit that the observation made by the witness Rantis (Reuter) was "about 5:30 P.M. He wasn't exactly sure of the exact time by minute."[3] (Vol. 2, p. 274) The "at that same time" phrase was added on his own initiative by Detective Bonura. (Vol. 2, p. 288)
Also, the 5:15 time did not have a factual basis and apparently originated with Detective Bonura. Philomene Cusachs testified that she told the police she talked to the victim "near 5:00" (Vol. 2, p. 232) Her testimony was: "And he says, `Would you say it was closer to 5:15 than to 5:00?' I said, `No. I firmly recall it was just maybe a few minutes after 5:00.'" (Vol. 2, p. 233)
While the time differential is small, it becomes important when considered with a salient fact omitted by the police in preparing the warrant. Calogero told the police Lingle said Miss McLeod and Mrs. Cusachs were talking on the telephone while he was leaving the Cusachs' residence. (Vol. 2, p. 266) This statement was left out of the affidavit. The Cusachs' house where Lingle resides with his grandmother is two or three miles from the scene of the homicide. If the magistrate had been apprised that Lingle said he was two or three miles from the scene of the murder shortly after 5:00 p.m., he may have inferred that some other party had been knocking on the door.
When material facts are omitted from an affidavit, the reviewing court must add those facts and retest the question of probable cause. State v. Lehnen, 403 So.2d 683 (La., 1981); State v. Patterson, 422 So.2d 1131 (La., 1982).
The sufficiency of the affidavit must be considered after deleting the statements to the effect that Lingle told Calogero he was at the scene at the time of the murder, or when McLeod was killed; deleting the statement that Lingle's grandmother was talking on the telephone to the victim at 5:15 p.m.; deleting the statement that at the same time a neighbor saw a person fitting Lingle's description at the victim's house; and adding the fact that Lingle said he was at the Cusachs' residence when Mrs. Cusachs was talking to the victim on the telephone.
The question is whether the restructured affidavit gave probable cause for issuance of the warrant.
PROBABLE CAUSE
Probable cause is difficult to define. In the leading treatise on the Fourth Amendment, Professor LaFave mentions several scholarly articles and court decisions, which say that probable cause is: an "exceedingly difficult concept to objectify"; "a plastic concept"; a balance between rash and unreasonable interferences and the fair leeway for enforcing the law; something recognized by "a prudent man", "a man of reasonable caution" or "a reasonably discreet and prudent man".[4]
Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) sets the *463 limits of probable cause: not the weight of evidence required to prove guilt; less evidence than would justify condemnation; more than mere suspicion. Brinegar does not delineate where, between proof beyond a reasonable doubt and mere suspicion, the facts and circumstances amount to probable cause.
One concept which should aid in determining probable cause is the "more probable than not" theory. However, neither the federal nor state courts have arrived at a suitable rule for the degree of probability required to believe that a given individual is the perpetrator of a known offense.[5]
Louisiana has adopted the rule that "probable cause exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." State v. Johnson, 408 So.2d 1280, 1283 (La., 1982).
"A search warrant may not be issued upon an affidavit reciting nothing more than the affiant's reasonable cause to suspect that the premises shelter contraband or evidence of crime." State v. Tassin, 343 So.2d 681, 689 (La., 1977).
"The factual information which is the foundation for the determination of probable cause must be contained in the affidavit.... Mere suspicion or belief is not sufficient." (citations omitted) State v. Flood, 301 So.2d 637, 641 (La., 1974).
An appellate court should avoid substituting its own judgment for that of the magistrate and should only determine whether there was a substantial basis for the determination of probable cause, recognizing that a showing of probable cause requires much less evidence that proof beyond a reasonable doubt. State v. Ogden, 391 So.2d 434 (La., 1980).
SUFFICIENCY OF THE AFFIDAVIT
Since this affidavit required reformation, the deference generally due the magistrate's conclusion as to probable cause is not required. The action of the trial court rather than that of the magistrate is at issue, and the trial court's judgment is due deference. Compare Iverson v. State of North Dakota, 480 F.2d 414 (8 Cir.1973), cert. denied 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335.
The trial court focused on the inaccuracy of the affidavit in stating that Lingle admitted being present at the time of the murder. The trial court implied that the misrepresentation was not made in good faith, stating that "even if this court gives the affiant the benefit of the doubt as to the misrepresentation being made in good faith; the search warrant still must be quashed since the residue does not establish probable cause." (Vol. 2, p. 339) The testimony of Detective Bonura, who confected the affidavit, is not a model of candor.[6] The trial court noted that "reasonable suspicion alone may never form the basis for the issuance of a search warrant to search a person's home," (Vol. 2, p. 341) and concluded:
"The police were totally justified in their suspicion of the defendant in connection with this crime.
"However, that suspicion should have only motivated the officers to seek additional facts to include within a search warrant.
"In and of itself the suspicion cannot justify the issuance of the warrant."
Review of the restructured affidavit supports the trial court's conclusion. The police officers had reason to suspect Lingle of being involved in the homicide: however, there was no concrete evidence which would *464 justify a reasonable person in believing that Lingle had committed the offense. There is nothing in the affidavit indicating that it is probable that Lingle killed the victim. Suspecting Lingle, the police wanted to search his house for evidence which would give reason to believe he was guilty.
There is nothing in the affidavit which explains why the police wanted to look for tennis shoes; nothing to indicate that property was taken from the house in which the homicide was committed; and nothing to suggest that prescription bottles were missing.[7] The only facts in the affidavit relating to the property described in the warrant pertain to the statements that Lingle scratched his arm and the victim was bleeding. Therefore, the only connexity between the facts of the crime, as recited in the affidavit, and the property described in the warrant, is "[b]lood stained clothing". There is a wide discrepancy between most of the items for which the police allegedly obtained the search warrant and the facts stated in the affidavit.[8] When the facts are not "... sufficient to support a reasonable belief ... that evidence or contraband may be found at the place to be searched", there is no probable cause.[9]
Accordingly, the trial court was correct in determining that the police had reasonable suspicion but lacked probable cause for the search warrant. The judgment of the trial court granting the motion to suppress should be sustained.
I respectfully dissent.
NOTES
[*] CALOGERO, Justice, recused on original submission and on consideration of petition for rehearing.
[1] The entire affidavit reads as follows:

"On Saturday March 13, 1982 Miss Janet McLeod w/f 61 was brutally killed at at 5401 St. Bernard Ave. Since that time an investigation has transpired.
"On Monday, March 15, 1982 Dets. Bonura and Farrar had occasion [sic] to interview a known witness identified as Steve Calogero w/m age 17. According to Calogero on Sunday March 14, 1982 he talked with a Scott Lingle w/m 15 whom he knows a [sic] friend. Calogero learned from Lingle that Lingle was at the scene of the murder on the day of the murder and at the time of the murder. According to Calogero Lingle stated he was at the house knocking on the front and rear doors when McLeod was killed. According to Calogero Lingle stated further that he tried the rear carport door and the door opened and he enterd [sic]. Lingle found McLeod on the floor face down lying in a pool of blood. Lingle turned McLeod over and heard a gurgling sound like blood coming from a neck wound on McLeod. Lingle stated he ran knocking over a ceramic cat breaking it on the floor. Lingle stated he her [sic] Mrs. Seicnaydre [sic] who was an invalid in one of the bedrooms ringing a bell she used to call for assistance from her bed. Lingle related he ran out the front door and to a nearby bus stop where he waited a short time but no bus came. Lingle stated he ran till he dropped and got a ride home with an unknown negro female. According to Calegero [sic] he noticed a scratch on the left forearm of LKingle [sic] but Lingle stated he got the scratch after he ran out the house and was jumping fences.
"Through investigation it was determined that Scott Lingle's sister resided at 5401 St. Bernard until just a short time ago and that Scott Lingle had been to the residence before.
"Scott Lingle was determined to have run away from his father's home in Ocean Springs Mississippi and was staying at 4603 Venus St. with his grandmother. This was confirmed through interview with the grand-mother Mrs. Mary Lou Cusachs [incorrect reference to Philomene Cusachs] who resides at that address.
"Scott Lingle stated he entered an [sic] found McLeod dead[;] however through investigation it was determined that McLeod was on the telephone with Mrs. Cusachs at about 5:15 P.M. Saturday March 13, 1982 and stated someone was at the door and that she would have to go and hung up the phone. This was the last person to talk [to] McLeod alive. Also at that same time a neighbor identified as James Reuter [an incorrect reference to Mike Rautis] w/m age 25 living across the street from the murder observed a white male fitting the description of Lingle get out a white vehicle and go to the rear carport door and knock and then to the side door on Mithra st. and knock and then return to the rear of the house but Reuter lost sight of him near the Mithra St. rear yard. This conflicts with Lingle's statement that he entered the residence because the door was open/ Also only someone who was in the residence could have known about the ceramic cat being overturned and broken.
"It is for the above reasons that I request permission to search the residence at 4603 Venus." (Emphasis supplied)
[2] In this regard, we note that this case involves a search warrant, not an arrest warrant, and it was not necessary to establish probable cause to arrest defendant for murder.
[3] When such inaccuracies are shown at a suppression hearing, the court must determine whether those sometimes inevitable but good faith distortions have reached a level which defeats the validity of the affidavit. This determination should be made by the process of "retesting" described in State v. Rey, above, and State v. Lehnen, above.

Louisiana courts have viewed an intentional misrepresentation to the magistrate as a fraud upon the courts and impermissible governmental overreaching. See State v. Rey, above, at 492. In such a case, the proper sanction generally is to quash the warrant. However, under the United States Supreme Court's approach in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), even deliberate falsehoods by a police affiant or statements by a police affiant evincing a reckless disregard for truth need only be excised from the affidavit. The remaining facts are then examined to determine whether they warrant a finding of probable cause absent the misrepresentations. The Rey decision provided a more realistic approach to reprehensible police conduct, which the exclusionary rule is designed to prevent.
[4] At the hearing, the grandmother testified that the victim was "quite a conversationalist", an indication that the conversation may have lasted for some considerable period of time. Of course, the length of conversation also bears on the importance of defendant's presence in the Cusachs' residence during part of the conversation.
[5] This court has recognized the great significance of unquestioned proof of the commission of a crime on the establishment of probable cause. See State v. Johnson, 363 So.2d 684 (La.1978); State v. Drott, 412 So.2d 984 (La. 1982); State v. Collins, 378 So.2d 928 (La. 1979); State v. Mosley, 390 So.2d 1302 (La. 1980); State v. Floyd, 435 So.2d 992 (La. 1983).
[6] This court has recognized in prior cases that flight, although not alone determinative of probable cause, is a factor to be considered in support of probable cause, because flight may be an indication of "consciousness of guilt". See State v. Burge, 359 So.2d 616 (La.1978); State v. Lee, 381 So.2d 792 (La.1980).
[1] The trial court stated that there was serious doubt whether the affidavit established probable cause even if the misrepresentations were not excised.
[2] The information was obtained from Mike Rantis rather than James Reuter, but the explanation offered by Detective Bonura that this was simply human error appears to be correct and no legal significance attaches.
[3] Detective Bonura had a slightly different version of the time element, testifying that the investigation notes indicated "5:00 P.M. to 5:30 P.M., possibly later." (Vol. 2, p. 288)
[4] LaFave, Search and Seizure, West Publishing Company, St. Paul, 1978, Section 3.2, pp. 449-459.
[5] Professor LaFave's treatise suggests that this approach is appropriate only to determine whether there is probable cause to believe that a crime has been committed, not whether a given individual has committed a known crime. LaFave, supra, pp. 484-485.
[6] See the discussion of the proposed "reasonable good faith" exception to the exclusionary rule in Volume 73 of The Journal of Criminal Law and Criminology at page 916.
[7] The warrant listed the following property as objects of the search:

"1) Blood stained clothing.
"2) unknown type shoe with ridges on the soles similar to a tennis type shoe
"3) any and all property that may have been taken from the residence at 5401 St. Bernard; prescription bottles in the names Janet McLeod; Helen Russell or Emma Seicnaydre."
[8] In Iverson, supra, there was not one but a "considerable number" of scratches. 480 F.2d at 417. They were present on the suspect's hand, neck and arms. The search warrant was apparently limited to describing items of evidence, supported by the affidavit, such as blood stained clothing. See State v. Iverson, 187 N.W.2d 1 (1971).
[9] State v. Johnson, supra.