640 So.2d 847 (1994)
STATE of Louisiana, Appellee,
v.
Jerry McLEMORE, Appellant.
No. 26106-KA.
Court of Appeal of Louisiana, Second Circuit.
June 24, 1994.
*850 Geary S. Aycock, West Monroe, for appellant.
Richard Ieyoub, Atty. Gen., Baton Rouge, Walter E. May, Jr., Dist. Atty., Jonesboro, for appellee.
*851 Before MARVIN, C.J., and HIGHTOWER and VICTORY, JJ.
VICTORY, Judge.
In response to an indictment charging defendant with the second degree murder of his wife, a jury found Jerry McLemore, guilty as charged. LSA-R.S. 14:30.1(A)(1). The court imposed the mandatory term of life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant appeals his conviction urging eight assignments of error. We affirm.

FACTS
On the evening of September 11, 1991, police were summoned to the J & R Quick Stop in Chatham, Louisiana, to investigate the shooting death of Elizabeth Anne McLemore ("Anne"). The victim's husband, Jerry McLemore, reported that earlier that night the couple had traveled from their home in West Monroe, Louisiana, to their deer camp near the town of Chatham in Jackson Parish, Louisiana, to retrieve a brush-cutter needed for lawn work. On the way, they stopped at the J & R Quick Stop. While defendant was inside, Anne waited in their Jeep Cherokee.
According to defendant's statements to police, while he was inside the store, a white male with a long blond ponytail and goatee made lewd gestures to his wife. He remembered seeing a light-colored "Pinto-type" station wagon ("Pinto") and a blue and grey Ford four-wheel drive pickup truck in the parking lot of the convenience store. As the couple drove away, Anne made an obscene gesture to the man.
To reach the camp, defendant told police that he bypassed the most direct route, as there had been recent logging activity on that road and Anne did not want the Jeep to be muddied. Instead, he took a route that passed a nearby camp known as the Browder homeplace. After retrieving the brush-cutter, defendant closed up the camphouse while Anne returned to the Jeep to wait. At this point, he heard gunfire, ran outside and saw that his wife had been shot and that the Jeep's rear window had been shattered. Defendant stated that he also came under rifle fire from a man standing at the end of the driveway, whom he recognized as the man seen earlier at the convenience store. He ran back inside the camphouse, armed himself with a .22 rifle and fired at the man several times before the assailant escaped into the Pinto seen earlier. The defendant ran out into the dirt road after the shooter, then back to the Jeep and drove towards Chatham for help. At the intersection of Parish Road 499 and Highway 4, he saw the car again and fired several rounds at it with his .22 rifle which was aimed out of the back window of the Jeep. However, the car did not give chase and drove away. Defendant's wife was already deceased when examined in Chatham.
Arriving at the camp, sheriff's deputies immediately noticed inconsistencies between defendant's account of the incident and the physical evidence present. The McLemore camp is located just off a dirt road, Parish Road 369, which had been freshly graded. Only three sets of tire tracks were visible. One set showed the McLemore's Jeep entering and exiting the camp driveway. Another set, truck tracks with mud grips, were underneath McLemore's and appeared to belong to a caretaker staying at the Browder camp just down the road. The third set of tracks had been left by the road graders. No other tracks were visible to corroborate defendant's account that the Pinto had traversed Parish Road 369 in front of the camp.
The driveway to the McLemore camp consisted of sandy dirt widely interspersed with small amounts of gravel. In some places, a few large pieces of carpet had been placed upon the driveway. Sheriff's deputies reconstructed the Jeep's placement in the driveway by the presence of glass from the vehicle's back window and tire tracks. Investigating officers noted that footprints made by Avia tennis shoes were present around the area of the Jeep, the front porch of the camphouse and the camp driveway. These tracks, however, were not present on Parish Road 369, contradicting defendant's statement that he chased the Pinto onto the road. Also, officers could not find footprints made by the victim on the sandy ground between the Jeep and the camphouse which would have corroborated defendant's account *852 that Anne had exited the Jeep and entered the house. A few tracks made by Reebok tennis shoes were found on Parish Road 369, as well as a single Reebok track noted in a wet depressed area in the front of the camp but pointing in the direction of Parish Road 369. Investigators began to theorize that defendant entered the camp driveway with his wife by car, went into the camphouse alone, changed shoes, exited through a rear door, circled around the camphouse to the edge of the driveway leaving behind the single Reebok track, shot his wife from behind, changed back into his Avia shoes, and drove his wife into Chatham.
A few days later officers discovered the murder weapon, a Remington .270 pump rifle with a Bushnell scope on it, in a creek bed underneath a bridge on the nearby Johns Road, which runs between Highway 499 and Highway 4. Mrs. Getta Harper, and her son, Tim, alerted the police to a pair of Reebok tennis shoes that they found alongside the Johns Road, a short distance from their home. The shoes appeared to match the Reebok prints noted at the crime scene. In addition, Mr. Eugene Harper reported that on the night of the murder, he saw a red vehicle pass, somewhat quickly, in front of his house which is located only 30 feet from the road. He observed that the vehicle's back glass looked strange, as if part of it was either missing or wiped clean. In defendant's version of the route taken from the camp back to Chatham, he did not travel the Johns Road in front of the Harper's residence, but instead returned to Chatham along Parish Road 369, Highway 499 and Highway 4.
J.T. Simons, the caretaker for the Browder camp located approximately 550 yards from the McLemore camp, recalled that he arrived at the Browder camp just before sunset the evening of the murder. Although it was his custom to leave the gate to this camp open when he was staying there, on this evening he deviated from that practice, and closed and locked the gate. He reported that around 9:00 p.m. he heard five loud shots fired by a high-powered deer rifle. He did not, however, hear any answering shots fired by a .22 rifle. The morning following the shooting, Mr. Simons visited the scene and noted, along with the police, only his tire tracks on Parish Road 369, those of the graders and the other set belonging to defendant.
An arrest warrant was issued for defendant, as well as two warrants for the search of defendant's home which resulted in the seizure of a Remington 1100 12-gauge shotgun. From their investigation, officers had learned that this gun, along with the murder weapon, belonged to Jason Sanford, a former neighbor of the McLemores, and had been reported missing by Sanford's mother, Sharon Thomisee.

ASSIGNMENT OF ERROR # 1
Defendant contends that the trial court erred in denying his pre-trial motion to suppress the physical evidence seized from his home. This case involves one arrest warrant obtained September 18, 1991, and two search warrants obtained September 18 and 19, 1991. Deputy Nelson Spillers of the Jackson Parish Sheriff's Office was in charge of the investigation, and he supplied the facts in each warrant affidavit. Defendant asserts that the affidavits are invalid because: (1) they contain material and intentional misrepresentations and omissions; (2) the searches were not good faith exceptions to the exclusionary rule; and (3) the evidence seized pursuant to the second search warrant, a Remington 1100 12-gauge shotgun, is "fruit of the poisonous tree" and should be suppressed.
Probable cause exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched. State v. Johnson, 408 So.2d 1280 (La.1982). An issuing magistrate must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a "fair probability" that evidence of a crime will be found in a particular place. The task of the reviewing court is simply to insure that the magistrate had a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, 462 U.S. *853 213, 239-41, 103 S.Ct. 2317, 2322-23, 76 L.Ed.2d 527 (1983); State v. Byrd, 568 So.2d 554 (La.1990); State v. Lingle, 436 So.2d 456, 460 (La.1983).
The making of material and intentional misrepresentations to a magistrate involves a fraud upon the courts and will result in the invalidation of the warrant and suppression of the items seized. State v. Byrd, supra; State v. Williams, 448 So.2d 659, 663 (La.1984); State v. Rey, 351 So.2d 489, 492 (La.1977). A defendant bears the burden of going forward on an allegation that an application for a search warrant contains intentional misrepresentation such as would render it invalid. State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied, 521 So.2d 1143 (La.1988). If the misrepresentations or omissions are inadvertent or negligent, the warrant will be retested for probable cause after supplying that which had been omitted or striking that which had been misrepresented. State v. Byrd, supra; Lingle, supra; State v. Lehnen, 403 So.2d 683, 686 (La.1981).

ARREST WARRANT
The facts recited in the arrest warrant affidavit include the following:
A. Jerry R. McLemore stated that after the killing of his wife he saw a man get into a vehicle being driven by another on Jackson Parish Road 369 which runs directly in front of the scene of the killing, when in fact the investigation of affiant revealed no tracks of such a vehicle, despite the fact that said road, which had a dirt/gravel surface, had been graded the morning of the day before the killing and clearly showed the tracks of the vehicle being driven on that road by Jerry E. McLemore immediately before and after the killing and one other vehicle, which has been positively identified and which does not match the description of the vehicle which said man got into by Jerry R. McLemore.
B. Jerry R. McLemore states that after the killing of his wife he chased the vehicle which the man who shot at him had gotten into by running after it on Jackson Parish Road 396 when in fact the physical evidence consisting of footprints clearly visible in said road, show that he did not do so; and
C. Jerry R. McLemore states that he was able to clearly see the person who was shooting at him standing on Jackson Parish Road 396 when affiant's investigation has revealed that there would not have been sufficient light to permit Jerry R. McLemore to be able to see anyone on that road at that time of night under the conditions Jerry R. McLemore described.
Defendant claims that paragraph B is false and misleading as he never stated that he went out on the dirt road. However, defendant's statements to Deputy Spillers clearly refute this notion. In one statement given the night of the murder, defendant stated that he "broke and run out in the road whenever I seen the car going like over the hill and I run up ... just run out into the gravel road there...." A more specific reference is contained in a second statement to Deputy Spillers, wherein defendant stated, "yes sir I did go out into the parish road." Given these statements, paragraph B cannot be said to contain false information.
Defendant argues that, in paragraph C, Spillers misrepresents the lighting conditions at the camp. At the hearing on the motion to suppress, Spillers testified that, standing on the porch with one light on in the camp, he was unable to see a deputy standing in the parish road. According to defendant's statements, additional illumination was provided by the Jeep's head and tail lights, as well as the vehicle's interior dome light, as the passenger door was open. Spillers's omission as to the possibility of additional available light does not appear to have been intentional or with a reckless disregard for the truth. Further, a reading of the entire affidavit clearly supports a finding of probable cause.

SEARCH WARRANT # 1
The fourth statement in the affidavit for this search warrant is as follows:
Jerry R. McLemore denied ever owning or having in his possession a 270 calibre rifle at any time prior to the shooting; and it *854 was a 270 calibre rifle that was used to kill Elizabeth Ann [sic] McLemore. Dr. Clyde Elliot has advised affiant that Dr. Elliot has seen Jerry R. McLemore in possession of such a rifle on a date prior to the shooting.
The defendant contends that this statement was misleading for two reasons. One, he argues that he never denied possessing a.270 rifle. Rather, he asserts that when he said he did not have such a rifle, he meant he did not own one. Second, he claims that Spillers misled the court by omitting the fact that when Dr. Elliot had seen defendant with a .270 rifle, it was approximately 10 years prior to Anne's death; and, that Dr. Elliot had testified that he believed that defendant "owned" a .270 rifle because he had seen one in his possession.
Spillers's statements cannot be construed as either false or misleading. During questioning, the following exchange occurred:
Spillers: Okay, do you ... do you have a 270 deer rifle?
McLemore: No, sir, I do not.
Spillers: Have you ever?
McLemore: Never.
Spillers: Never?
McLemore: Never ... never, never, never. I'm a 30-06 man. Every one of my rifles was 30-06's or 22's.
This vehement denial that he ever had such a rifle coupled with the information received from Dr. Elliot supports Spiller's recitation of the facts. Thus, the affidavit in support of this warrant cannot be reasonably characterized as a misrepresentation of defendant's statement.

SEARCH WARRANT # 2
The affidavit relied upon to obtain this warrant contains the following statements:
During the investigation of the homicide of Elizabeth Ann [sic] McLemore, a former neighbor of Jerry McLemore's informed Deputy Spillers that her residence had been burglarized in 1990 and that a 270 Remington deer rifle and a Remington 1100 12-gauge shotgun had been stolen. She further stated that both weapons had been purchased at local stores.
During a search, pursuant to a Search Warrant, of Jerry R. McLemore's residence located at 105 Westland Place, West Monroe, Louisiana on September 18, 1991, a Remington 1100 12-gauge shotgun with the serial number of N894501V was discovered in a gun cabinet.
A check of the store where the gun had been purchased by the neighbor referred to above, uncovered a record of the purchase by the same neighbor of a Remington 1100 12-gauge shotgun with the serial number of N894501V.
It is believed that the murder weapon was the same neighbor's 270 Remington deer rifle and the Remington 1100 12-gauge shotgun with serial number N894501V were stolen at the same time from the neighbor's residence; and, the Remington 1100 12-gauge shotgun may lead to additional evidence in this homicide investigation.
Defendant contends that Spillers intentionally misled the court to believe that he had knowledge of the stolen shotgun's serial number at the time he applied for the warrant. In support, he points to Spiller's testimony at the hearing that he did not have the serial numbers of either weapon before the September 19, 1991, search.
Spillers testified that Sharon Thomisee, the neighbor referred to in the affidavit, provided him with information on the stolen guns on September 17, 1991. He then began checking with Ted's Gun & Reel and Wal-Mart, the gun's retailers, for serial number information contained in log books and federal firearms forms. Spillers testified, however, that copies of the records were not actually received until after the execution of the second warrant. It is clear from the sequence of events surrounding the searches that Spillers mistakenly believed defense counsel was referring to possession of the actual documents listing the serial numbers. Clearly, Spillers was at least privy to the serial number information when applying for the warrant because the serial number information is contained in his affidavit in support of that warrant. The record supports the *855 statements made by the affiant and the conclusion that a search was warranted. State v. Byrd, supra. Defendant's contentions that the searches were not in good faith and that the evidence seized pursuant to the second search warrant is "fruit of the poisonous tree" are without merit. See United States v. Leon, 468 U.S. 897, 922-924, 104 S.Ct. 3405, 3420-21, 82 L.Ed.2d 677 (1984).

ASSIGNMENT OF ERROR # 2
In this assignment, defendant asserts that the trial court erred in: (1) denying his motion for change of venue on October 15, 1992; and (2) failing to grant his motion for a change of venue after the jury selection. In support thereof, defendant submitted copies of newspaper articles and videotapes of local news broadcasts to suggest that the publicity attendant to the case made it impossible for him to receive a fair trial.
A change of venue shall be granted when a defendant proves that, by reason of prejudice existing in the public mind, or for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. LSA-C.Cr.P. Art. 622. For a discussion of the factors to be considered in determining whether a change of venue is appropriate, see State v. Brown, 496 So.2d 261 (La.1986); State v. Henderson, 566 So.2d 1098 (La.App. 2d Cir.1990); and State v. Hall, 549 So.2d 373 (La.App. 2d Cir.1989), writ denied, 556 So.2d 1259 (La.1990).
The defendant bears the burden of proving that he cannot obtain a fair trial in the parish where the prosecution is pending. State v. Henderson, supra. This burden requires a showing of more than mere knowledge by the public of the facts surrounding the offense. State v. Giovanni, 409 So.2d 593 (La.1982); State v. Henry, 446 So.2d 1308 (La.App. 2d Cir.1984). A defendant who seeks a change of venue must show that such prejudice exists in the collective mind of the community that a fair trial is impossible. State v. Clark, 442 So.2d 1129 (La.1983); State v. Neslo, 433 So.2d 73 (La.1983); and State v. Griffin, 618 So.2d 680 (La.App. 2d Cir.1993), writ denied, 625 So.2d 1063 (La. 1993).
A trial court has great discretion in granting or denying a motion for change of venue. State v. Flood, 301 So.2d 637 (La. 1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975); State v. Henderson, supra. A reviewing court may nevertheless make an independent evaluation of the facts to determine whether the accused received a trial which was free and unfettered by outside influences. State v. Griffin, supra; State v. Henderson, supra.
The publication of the articles and airing of news broadcasts coincided with the progress of the prosecution. Beginning with an initial account of the murder, the defendant's arrest, preliminary examination and release on bail, the media continued to report on the actions of the grand jury, arraignment and setting of trial date. In addition, defendant submitted newspaper articles reporting on the perjury case of Ivrin Bolden. Bolden, acquitted of the murder of a Northeast Louisiana University student, had admitted to that crime in a subsequent confession of murder in another state. Defendant argued that it was clear from those clippings that the prevailing public sentiment would not allow another accused murderer in the area to go free. Our independent review of the record shows that the defendant fell far short of proving a change in venue was required for him to obtain a fair trial. The trial court correctly denied the written motion. Cf. State v. Brown, supra; State v. Bell, 315 So.2d 307 (La.1975); and State v. Griffin, supra.
Following the completion of jury selection, the defendant reurged the motion to change venue. The potential jurors were questioned individually on the issue of pretrial publicity. Initially, all 36 admitted that they had heard or read something about the case and of that number, 7 reported that they had a fixed opinion.
The record reflects that three prospective jurors were excused for cause because of a fixed opinion based on publicity about the case. The remaining prospective jurors demonstrated only a cursory familiarity with the case and all denied that published accounts of the case would affect their ability to apply the law fairly. Defendant clearly *856 failed to show that the nature or frequency of publicity, the source of the information, or other factors prejudiced the collective mind of the community. The ruling of the trial court again denying the motion for change of venue was clearly correct. This assignment has no merit.

ASSIGNMENT OF ERROR # 3
Defendant contends the trial court erred in failing to grant his request for a continuance based on the state's failure to advise the defense of the existence of Brady material until shortly before trial. The evidence at issue consists of a statement made by Lana Naron Mobley and an anonymous telephone tip. In her statement, Ms. Mobley related that, on September 11, 1991, two men came to her home to look at a truck that her husband had for sale. She had heard about the McLemore shooting and the description of the assailant given by defendant. She described one of the two men as having a long ponytail. When shown a composite sketch of the suspect, she stated that the drawing looked like the man who had been at her home.
The anonymous tip was given in a telephone call received by Deputy Trish Cannon of the Ouachita Parish Sheriff's Office, on September 18, 1991. Deputy Cannon's report describes the call as follows:
On 09-18-91 around 2300 hrs I received a call from an anonymous white male. He stated that he knew the man who drove the vehicle in the shooting of Elizabeth Ann [sic] McLemore. He stated that he went by the name of "Spider." The only physical discription [sic] he could give was a white male with a goatee. He drove a '79 Ford 4 wheel drive blue & grey in color. He was staying in an area called Marango Swamp Bottom or off Bayou Lafourche at "Buddy's Camp." If you need a copy of the tape please let me know. I wasn't sure if this was important information but it isn't my decision to make.
On October 9, 1991, defendant hand delivered to the district attorney a Brady motion for exculpatory evidence which was later filed into the record on January 31, 1992. The contents of Ms. Mobley's statement were provided to the defense in May 1992. On October 8, 1992, eleven days before trial, the district attorney provided the tip information to the defendant, who filed for a continuance on October 14, 1992.
At the hearing on the motion held October 15, 1992, Deputy Cannon testified that she prepared a report on the tip and sent it to Deputy Beth Lord. Deputy Lord received this report on September 20, 1991, and by telephone and written communication, forwarded the information within a couple of days to Deputy Nelson Spillers. Spillers, in turn, reported the information to Jackson Parish District Attorney, Walter May.
District Attorney May testified that he had the material for approximately eight months before giving it to the defendant on October 8, 1992. As soon as he read it, he knew that he was "looking at something that was potentially Brady," and requested that Spillers follow up on the lead more than one time, but Spillers failed to do so. May testified that he wanted to follow up on the tip himself. After he assigned Spillers to investigate, the information went back into the D.A.'s file and was simply overlooked until May recalled, shortly before trial, that a report had not been made. On October 14, 1992, at May's insistence, Deputy Spillers sent three deputies to the Marango Swamp, however, no person fitting the description given in the tip could be located.
Jeff Bayles, a former auxiliary reserve deputy for Caldwell Parish and defendant's first cousin, testified that his efforts to locate "Spider" in the Marango Swamp area resulted in the identification of three men possibly answering to that nickname. However, the defense stipulated that one of those men was not involved in the case and no other evidence was presented to link either of the other two men to the murder.
The trial court denied the motion for continuance, finding that there was no showing with any certainty that the whereabouts of a "Spider" could be determined or even that there was a "Spider." It noted further that, even if "Spider" existed, no showing had been made that he could be located and available for trial at any point. The court opined that the information on "Spider" was *857 too unreliable, vague and nebulous to merit a continuance.[1]
When the defendant requests it, the state must disclose evidence favorable to the accused, if that evidence is material to guilt or innocence. When exculpatory evidence that was requested by the defense is withheld until after trial and conviction, due process requires a reversal of the conviction. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This remedy is based on the theory that the trial court had no opportunity to address and correct the prejudice created by the late disclosure. State v. Barker, 628 So.2d 168 (La.App. 2d Cir.1993); State v. Ashley, 463 So.2d 794 (La.App. 2d Cir.1985). When disclosure of new evidence occurs before trial, the trial court has great discretion to fashion a remedy that will offset the potential prejudice. LSA-C.Cr.P. Art. 729.5; State v. Baldwin, 388 So.2d 664 (1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981); State v. Barker, supra; State v. Ashley, supra. Not all cases involving late disclosure of exculpatory evidence result in reversible error. It must be determined whether the late disclosure so prejudiced the defendant that he was denied his constitutional right to a fair trial. State v. Smith, 430 So.2d 31 (La.1983); State v. Hunter, 571 So.2d 834 (La.App. 3d Cir.1990); State v. Cook, 535 So.2d 988 (La.App. 4th Cir.1988).
In this case, the defense had approximately five months prior to trial to develop and use the information contained in the statement by Ms. Mobley. Additionally, Ms. Mobley testified at trial and was subject to full cross-examination. Accordingly, no prejudice resulted from the trial court's denial of the motion for continuance with regard to the delayed disclosure of her statement.
Likewise, defendant has not shown that he was prejudiced by the denial of a continuance so that "Spider" could be located. That "Spider" could have been the driver of the vehicle used in Anne McLemore's shooting is fantastic, given that the tire print evidence negated even the presence of another vehicle on Parish Road 369 other than those previously identified. Further, the description of "Spider" would tend to fit defendant's description of the shooter, although the tipster described the man as the driver of the vehicle in the shooting. In the period between the disclosure of the tip and the expiration of the time for filing a motion for new trial, defendant did not demonstrate that "Spider," if he even exists, could be located. Moreover, defendant has not shown what evidence could be provided by locating him that would have a bearing on this case. While we strongly disapprove of the failure of the state to furnish the tip information to the defense when Brady material was requested, the defendant failed to establish that he was so prejudiced by the delay that he was denied a fair trial. Accordingly, we find no abuse of discretion in the trial court's denial of the motion for continuance.

ASSIGNMENTS OF ERROR # 4 & # 6
Defendant asserts that the trial court erred in denying his motion for mistrial and in denying his motion for new trial. These assignments of error are combined into one argument in brief. Defendant contends that the state deliberately elicited testimony from Lana Naron Mobley to impugn defense counsel's character. That, and his assertion that the jury was improperly influenced by an out of court spectator, form the basis of his motion for a new trial.

Lana Naron Mobley Testimony
(Motion for Mistrial and Motion for New Trial)
In his opening statement, defense counsel implied to the jury that Deputy Nelson Spillers had attempted to dissuade Lana Naron Mobley from speaking to the defense in this case. In referring to Ms. Mobley's inquiry as to whether she was required to talk to the defense, counsel stated:
Now, Nelson doesn't tell her, no don't go talk to `em, because he knows he can't do *858 that. But he left her the distinct impression that he'd just as soon she didn't.
In its case in chief the state called Ms. Mobley as a witness. She testified that when contacted by defense counsel she had refused to speak with him. She also stated that she called Deputy Spillers, who told her that it was her choice whether to speak with defense counsel, but that she could be subpoenaed. The state then asked:
If anyone had said that Deputy Spillers told you not to talk to the defense attorney or suggested that you not talk to the defense attorney, how would you characterize that statement? Is that true or false?
Ms. Mobley replied that it was false. It is this testimony that defendant complains impugned the character of defense counsel, and required a mistrial.
A mistrial is a drastic remedy, and it should not be declared unless the defendant suffers such substantial prejudice that he is deprived of any reasonable expectation of a fair trial. State v. Hooker, 623 So.2d 178 (La.App. 2d Cir.1993); State v. Womack, 592 So.2d 872 (La.App. 2d Cir. 1991), writ denied, 600 So.2d 675 (La.1991). Whether a mistrial should be granted is within the sound discretion of the trial court, and, absent a clear abuse of the trial court's discretion, the denial of a mistrial should not be disturbed on appeal. State v. Stills, 600 So.2d 134 (La.App. 2d Cir.1992).
Defense counsel's remarks during the opening statement were clearly intended to insinuate that the police had not been zealous in its investigation or that it was hiding evidence favorable to the defense. The state's questioning of Ms. Mobley attempted to correct that impression. Considering these circumstances, we find no indication that the defendant was unable to obtain a fair trial because of this remark. The jury heard the defense counsel's remarks and Ms. Mobley's testimony and was in a position to determine, if necessary, whether Ms. Mobley properly characterized those remarks. Accordingly, we find no abuse of discretion in the trial court's ruling denying the defendant's motion for a mistrial. This assignment of error is without merit.
In his brief to this Court, in support of his assertion that the trial court should have granted a new trial, defendant cites the same argument relating to the motion for mistrial. Having found no merit in that argument, we likewise find it is without merit when applied to the motion for new trial.

Extraneous Jury Influence
(Motion for New Trial)
The decision on a motion for new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Quimby, 419 So.2d 951 (La. 1982); State v. Hebert, 443 So.2d 620 (La. App. 3d Cir.1983). The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. As a general rule, a motion for new trial will be denied unless injustice has been done. LSA-C.Cr.P. Art. 851; State v. Dickerson, 579 So.2d 472 (La.App. 3d Cir. 1991), modified on other grounds and affirmed, 584 So.2d 1140 (La.1991).
Following the jury's verdict, defendant moved for a new trial on the basis that one of the jurors, Arthur Buckelew, had violated the rule of sequestration by discussing the case with a friend, Jim Fordham, and that this conversation had improperly influenced the jury in reaching its verdict. At a hearing held on the matter, Attorney Darrell Avery testified that Fordham made a sales call to his office on November 5, 1992. While in the office, Fordham boasted that he had spoken with three jurors in the McLemore case during the trial and that it was the consensus of the jury that defendant was "guilty as sin." Mr. Avery's secretary, Judy Davis, also in the office, confirmed this account. Fordham admitted that, while he may have made that statement, he tends to exaggerate and that, in reality, he had only spoken with Buckelew prior to the jury's deliberation on the last day of trial. He explained that he and Buckelew attend football games together for which they purchase season tickets. On the day in question, Buckelew visited Fordham's office to give him some information regarding the tickets. Aware that Buckelew was a juror, Fordham *859 asked him how he would rule, but Buckelew refused to respond. Fordham denied that he ever expressed his own opinion in the matter.
Buckelew testified that while discussing the season ticket purchase, Fordham asked him, "Well, do you think he's guilty?" When the juror made no response, Fordham further inquired as to when he expected the trial to end to which Buckelew replied, "today." Buckelew stated that Fordham did not express an opinion as to defendant's guilt or innocence, and he denied reporting the conversation to the remaining jurors.
Initially in any trial, there is a presumption of jury impartiality. United States v. Winkle, 587 F.2d 705, 714 (5th Cir.), cert. denied, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); State v. Bibb, 626 So.2d 913, 922 (La.App. 5th Cir.1993). However, any unauthorized communication, contact, or tampering directly or indirectly, made by a nonjuror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. The presumption is not conclusive, but the burden rests heavily upon the state to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to defendant. Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); State v. Marchand, 362 So.2d 1090, 1092 (La.1978); State v. Bibb, supra. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the state to show that the influence demonstrated was not prejudicial. State v. Sinegal, 393 So.2d 684, 687 (La.1981); State v. Bibb, supra.
Here, even if the extrajudicial contact made by Fordham was presumptively prejudicial, the state clearly sustained its burden of proving that it was harmless to defendant. Buckelew was adamant that the incident had no effect on his impartial service as a juror. When questioned individually, all of the remaining jurors testified they had no knowledge of Fordham's contact with Buckelew. The evidence shows that the unauthorized contact between Fordham and Buckelew did not taint the jury's deliberations or prejudice the defendant. We find no error in the denial of defendant's new trial motion.

ASSIGNMENT OF ERROR # 5
Defendant submits that the trial court erred in permitting the state to introduce improper rebuttal testimony. Specifically, he points to the testimony of Thomas Wilder, Helen Traxler, David Traxler, and the state's attempt to call Katherine Webb as a rebuttal witness.
Rebuttal evidence is that which is offered to explain, repel, counteract, or disprove facts given in evidence by the adverse party. In criminal cases, such evidence may be used to strengthen the state's original case. LSA-C.E. Art. 611(E). Control of evidence presented by the state on rebuttal is within the sound discretion of the trial court, and will not be disturbed except in extreme cases such as when the evidence was kept back deliberately for the purpose of deceiving and obtaining an undue advantage. State v. Williams, 445 So.2d 1171 (La.1984); State v. Bass, 595 So.2d 820 (La.App. 2d Cir.1992), writ denied, 598 So.2d 373 (La. 1992).
Thomas Wilder testified that, after defendant gave his second statement to police in which he forcefully denied having a.270 rifle, Wilder was present in a car with defendant and defendant's father. During the drive, defendant questioned his father, "I have never owned a 270, nor have I had a 270 in my possession, isn't that right?" During his case, defendant had attempted to show that he believed Spillers to be referring to ownership of a .270 rifle, not possession. He further presented evidence that, at one time, he may have possessed a .270 automatic rifle that belonged to his brother, but that he had never possessed the murder weapon. The state introduced the rebuttal testimony to show that defendant understood Spiller's question to include both ownership and possession. As such, the evidence tended to *860 counteract the defendant's facts and was proper rebuttal.
Next, defendant complains about the testimony of Helen Traxler. Ms. Traxler, a close friend of the victim, testified that Anne McLemore hated her husband's guts and resented him because he could not or would not work. She recalled that on a trip the women took to Florida in July 1991, Anne expressed that "she was tired of his st." Defendant contends that the testimony constituted evidence of the victim's state of mind that was not at issue and thus, the evidence was improper rebuttal.
During defendant's case, he introduced the testimony of other friends of the couple to show that Anne had not exhibited any conduct suggesting marital discord. Although the couple had separated in 1989 because of defendant's extramarital affair with Holly Sanders, then seventeen, the couple had since reconciled. According to his two daughters and parents, defendant's relationship with his wife had been ideal at the time of the murder. With the door to evidence regarding the couple's relationship clearly open, Ms. Traxler's testimony was proper rebuttal as it tended to disprove the defendant's evidence.
Defendant's contention that the state's attempt to call Katherine Webb as a rebuttal witness constitutes reversible error is without merit. When the state announced Ms. Webb, defendant objected and the jury was removed for argument. The objection was subsequently sustained and no testimony was elicited from this witness.
Similarly, when David Traxler testified that he was aware of defendant's affair with Ms. Sanders, the state attempted to elicit information about other possible extramarital infidelities. Defendant's objection to this questioning was immediately sustained. Defendant's assertion that this exchange amounted to improper rebuttal is without merit.

ASSIGNMENT OF ERROR # 7
In this assignment of error, the defendant contends that the trial court erred in failing to give his Special Jury Instruction No. 2, and further erred in instructing the jury on circumstantial evidence with an incorrect statement of the law. In pertinent part, LSA-C.Cr.P. Art. 807 provides that:
A requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
As part of its instructions, the trial court charged the jury as follows:
Evidence is either direct or circumstantial. Direct evidence is evidence which if believed, proves a fact. Circumstantial or indirect evidence is evidence which if believed, proves a fact and from that fact, you may logically and reasonably conclude that another fact exists.
You cannot find a defendant guilty solely on circumstantial evidence, unless the facts proved by the evidence exclude every reasonable hypothesis of innocence.
Defendant's proposed charge is identical to that given by the trial court with the exception of the word, "solely," included in the latter. Defendant argues that the inclusion of "solely" misled the jury into believing that the circumstantial evidence rule did not apply in this case. According to defendant, this resulted in relieving the state of its burden of excluding every reasonable hypothesis of innocence.
In a case involving circumstantial evidence, the defendant is entitled to an instruction that jurors must be satisfied that the overall evidence excludes any reasonable hypothesis of innocence. LSA-R.S. 15:438. State v. Flowers, 574 So.2d 448 (La.App. 2d Cir.1991), writ denied, 580 So.2d 666 (La. 1991). Jury charges must be considered as a whole. State v. Motion, 395 So.2d 1337 (La.), cert. denied sub nom. Motton v. Louisiana, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981). In reviewing jury charges the court of appeal must consider whether any potential ambiguity in the trial court's charge on circumstantial evidence was harmless error. State v. Davis, 541 So.2d 831 (La.1989); State v. Flowers, supra.
*861 Defendant's argument has been squarely rejected by this court in State v. Flowers, supra, and identical charges have been approved in State v. Jones, 535 So.2d 3 (La. App. 4th Cir.1988); State v. Prince, 520 So.2d 778 (La.App. 3d Cir.1987), writ denied, 522 So.2d 567 (1988); and State v. Wiggins, 518 So.2d 543 (La.App. 5th Cir.1987), writ denied, 530 So.2d 562 (1988). The charge is neither misleading nor an incorrect statement of the law. This assignment of error is without merit.

ASSIGNMENT OF ERROR # 8
In this assignment of error, defendant urges that the evidence was insufficient to support his conviction. In cases resting on circumstantial evidence, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438. As an evidentiary rule, it restrains the factfinder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to Prove, and then to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. State v. Shapiro, 431 So.2d 372 (La.1982); State v. Hammontree, 363 So.2d 1364 (La.1978).
The criteria for evaluating sufficiency of evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all elements of the crime proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Washington, 597 So.2d 1084 (La.App. 2d Cir.1992). An appellate court reviewing the sufficiency of the evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817 (La.1987); State v. Lott, 535 So.2d 963 (La. App. 2d Cir.1988). The circumstantial evidence rule does not establish a stricter standard of review than the more general Jackson v. Virginia formula, but a hypothesis of innocence that is sufficiently reasonable and sufficiently strong must necessarily lead a rational fact finder to entertain a reasonable doubt about guilt. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, supra.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. LSA-La. Const., Art. 5, § 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (1987).
Although the defendant did not testify, the jury listened to the recorded statements of the defendant, and was thus made aware of his version of the killing of his wife. As discussed earlier, the physical evidence at the scene negated the presence of another vehicle on the freshly graded road and contradicted his version of the events in other respects. Mr. Simons testified that, although he clearly heard in the dead of night the five loud blasts from the deer rifle, he did not hear any return shots from a .22 rifle. Mr. Simons testified that he had been able to hear .22 shots from the McLemore camp on other occasions. Defendant was familiar with the neighboring Browder camp and the habits of Mr. Simons with regard to closing the gates to that camp. The jury could have concluded that, with this knowledge, defendant took the route to his camp that passed in front of the Browder camp, in order to check whether Mr. Simons was in residence that night. The jury heard credible evidence that defendant was in possession of a .270 pump rifle with a Bushnell scope in late June or early July 1991, prior to the shooting on September 11, 1991. No such weapon was found in either search of the defendant's house after the shooting. The murder weapon was reported missing by the Thomisee family along with the Remington 1100 12-gauge shotgun which was recovered from the defendant's home after the murder. That *862 rifle and a pair of Reebok tennis shoes were found along a route which was substantially out of the way for a direct return to Chatham with a dead or dying wife. Although the defendant denied taking this route, a fast moving red vehicle with an unusual back window was seen on the Johns Road on the night of the shooting traveling away from the site of the shooting. Mr. Harper testified that the Johns Road is so seldom traveled, with as little as one car a week passing his home, that he took special note of this vehicle. The defendant's former girlfriend, Holly Sanders, testified that, one week prior to the murder, defendant told her that his relationship with his wife was bad and that he wished he "had the nerve to take her out in the woods and kill her."
We find that a rational trier of fact, viewing all of this evidence in a light most favorable to the prosecution, could have concluded beyond a reasonable doubt that defendant's story of the killing was untrue, that every reasonable hypothesis of innocence had been excluded, and that defendant murdered his wife. This assignment of error is without merit.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] We note that Deputy Lord testified that anonymous tips are given the police department's lowest classification of probable veracity. Ranked in this way, information received by another police officer is given the highest priority, followed by information given by a concerned citizen who identifies himself, and tips received from reliable confidential informants.