STEWART, J.
|2Pefendant Tyrone Bowman was convicted of second degree murder, in violation of La. R.S. 14:30.1. He was sentenced to the mandatory life sentence at hard labor without benefit of parole, probation, or suspension of sentence for his second degree murder conviction. On appeal, the defendant challenges the sufficiency of the evidence presented, and the trial court’s denial of the motion for new trial. For the reasons stated herein, the defendant’s conviction and sentence are affirmed.
FACTS AND PROCEDURAL HISTORY
An armed robbery occurred at a Sonic restaurant in Lake Providence, Louisiana, on October 10, 2000. During the armed robbery, Sonic manager, Spencer Washington (“victim”), was shot and killed. On May 10, 2010, the defendant was implicated in the crime and charged with first degree murder via bill of indictment. On October 5, 2012, the indictment was amended to the charge of second degree murder. The defendant pled not guilty.
On March 20, 2013, the jury trial began. The following evidence was adduced at trial.
Officer Columbus Willis of the East Carroll Parish Sheriffs Office testified that shortly before midnight on October 10, 2000, he was dispatched to an armed robbery and shooting at a local Sonic restaurant. Upon arrival, he saw the victim lying unresponsive on the ground. He also saw a Sonic employee being inter *532 viewed by police officers who had already arrived at the scene. Officer Willis was briefed by another officer who informed him that the employee described the suspect as a male wearing a black mask, a black sweatshirt, and black pants. A second Sonic employee emerged from across the street from Sonic, and called out to Officer Willis hand another police officer. She informed them that the suspect had headed toward Grace Episcopal Church.
Based upon the information given, Officer Willis and Officer Lee Antwine commenced a foot search for the suspect. Since the ground was wet with dew, Officer Willis was able to spot footprints in the grass as they approached Grace Episcopal Church. The officers followed the footprints that headed toward “the trees,” and Officer Willis recovered a black sweater cap, that he identified as a black mask, under the trees.
Officers Willis and Lee proceeded through the trees, and traveled along First Street. As they approached West Street by the old Council on Aging building, Officer Willis testified that someone said, “I saw somebody ran [sic] through here and whoever it was took a sweater off, took off his shirt and threw it down and kept running.” Officer Willis saw a figure, but couldn’t see the person who made the statement. He was able to recover a black sweatshirt on the side of the old Council on Aging building. He stated that the sweatshirt did not appear to have been there long, since there was no dew on it.
The search ended at Darryl’s Mini Mart, which Officer Willis testified is not even a mile from the Sonic restaurant. Officer Willis noted that had they not stopped along the route, it would have taken about five minutes to get to Darryl’s Mini Mart from Sonic. Terrance Baker, an employee at Darryl’s, told Officer Willis that the defendant had come in the store wearing only an undershirt, and that he had given him a shirt to put on.
Brenda Thompson, a former cook at Sonic, testified that she witnessed the armed robbery. She noted that it occurred on a Tuesday night, Land that they were busy that night because of a 99-cent burger special that Sonic was having. After the restaurant closed at 10 p.m. that night, Thompson, Thompson’s coworker, Mia Tyler, and the victim remained at the restaurant for another hour to clean the kitchen. She testified that the victim carried a handgun in a case because the restaurant had previously been robbed twice. As they exited the restaurant, with the victim carrying the deposit bags and the case that housed his gun, a man dressed in a black mask, shirt, and mask approached them, brandishing a handgun. The man demanded the money from the victim. The victim refused, and the man grabbed Tyler. Thompson fled the scene, headed toward Grace Episcopal Church. She heard two gunshots, and Tyler yell that the man was headed toward her. Thompson saw the man run past the church, and head toward the Byerley house, which she stated was across the street from the church. When she saw that the man was out of sight, she ran back to Sonic and found the victim with a single gunshot wound to his chest.
Mia Tyler, the other Sonic employee who witnessed the robbery, testified that the suspect was wearing all black and had a handgun in his possession. The suspect came up behind Tyler and grabbed her. The victim was able to remove his gun from its case. The suspect attempted to use Tyler as a shield, but Tyler was able to flip him over her and onto the ground. Tyler stated that the suspect sprang to his feet, and the suspect and victim shot at each other. The victim was struck by a *533 bullet, and the suspect was able to grab the deposit bag and flee the scene.
Terrance ■ Baker, the cashier at Uncle Darryl’s Mini Market, testified that the defendant came by the store at approximately 11:00 p.m. He stated |Bthat the store closed at 11:00 p.m., but that it sometimes stayed open after 11:00 p.m. if it was busy. He stated that the defendant “wasn’t himself.” Baker asked the defendant what was wrong and if he had been fighting. The defendant informed him that he had. Baker remembered that the defendant was wearing a tank top that night, and that the defendant asked him for a shirt. Baker gave him one of the shirts he was wearing, and the defendant left.
Sergeant Gregory J. Pleasant with the Louisiana State Police testified that this case was assigned to him. During the course of his investigation, Sergeant Pleasant developed a number of possible suspects, and was able to eliminate everyone but the defendant. After reading the defendant his Miranda rights, Sergeant Pleasant interviewed the defendant, and he noted that during the interview he felt that the defendant was “toying with him”:
[The defendant] would say, “I’ll tell you about it later,” you know, he started with, “I’ll tell you about it if you give me a cigarette.”
Sergeant Pleasant noted that the defendant never denied committing the crime. Pleasant did submit a hair sample from the defendant, but the DNA results had not been given at the time he transferred to Baton Rouge, Louisiana.
James Branch, the defendant’s best friend in 2000, was in jail at the time the armed robbery took place. He testified that he had a friend, William Green, who worked at Sonic. Green informed him that Sonic was an “easy lick,” and closing time on Tuesdays is the best time to commit the robbery. Branch shared this information with the defendant. Branch also admitted | ñthat he had robbed this Sonic restaurant about a year before this armed robbery occurred.
While Branch was in jail in 2000, the defendant was taken into custody for a probation violation. Branch got the opportunity to speak with the defendant, and he testified that the defendant told him about the murder. The defendant explained that “the man wouldn’t give him [the defendant] the bag.” Branch did not come forward with this information until 2010.
James Thompson, the defendant’s cell mate for approximately two months in 2001, testified that while they were housed together, the defendant told him “about how he had pulled the robbery off at Sonic.” The defendant referred to the robbery as a shooting, and stated the male manager “wouldn’t turn loose the money box.” The defendant told Thompson that he was wearing a winter cap on the night the armed robbery occurred, and that when he ran, a tree branch snatched it off his head.
Julie Nailer, a forensic DNA analyst with the Louisiana State Police Crime Laboratory, was qualified as an expert in the field of DNA analysis. Nailer testified that her involvement in this case consisted of ABO blood typing, issuing a report in October 2000 regarding the blood type of the reference blood that was received, issuing a DNA report in 2008, and issuing two additional reports in 2013.
Nailer’s office received evidence and reference samples related to the armed robbery on October 18, 2000. This evidence included a brown envelope containing one fired 25-caliber shell casing, a white cardboard box containing a firearm, a fired 9mm shell casing, and a black stocking cap; a brown paper bag containing a long *534 sleeved black sweatshirt; a brown paper |7bag containing two shoes, two socks, pants, briefs, a shirt, and a jacket; a brown envelope containing one clear bag containing one box with a bullet taken from the victim; a brown envelope containing six tubes of body fluid taken from the victim; and a brown envelope containing one white envelope containing hair pulled from the defendant. Nailer actually tested the black sweatshirt, the stocking cap, the shell easing, the sample of body fluid, and the pulled hair.
Nailer commented that her laboratory was “behind the times,” and that she did not perform a DNA analysis on the stocking cap until February 18, 2008. After performing the testing on the stocking cap/ face mask, Nailer testified that she did detect some DNA, but it was an insufficient amount for her to make a conclusion. She also performed a DNA analysis on the sweatshirt on February 18, 2003, and was able to detect sufficient DNA around the collar of the sweatshirt that allowed her to obtain a profile. After comparing profiles obtained from the defendant and the victim, the Nailer concluded that the defendant could not be excluded from having worn the sweatshirt. Further, she testified that “approximately 97.4 percent of the population could be excluded as being a possible contributor of the DNA in this mixture.”
Jeff Goudeau, the supervisor of the firearms section at the Louisiana State Police Crime Lab, was qualified as an expert in the field of firearms. He testified that he examined the evidence recovered from the crime scene in February 2009. He concluded that the bullet extracted from the victim was not fired by the victim’s 9mm handgun. Rather, the bullet was consistent with a .25 caliber handgun.
IsWillie Robinson, Sr., who is currently the chief of police in the town of Rayville and was formerly chief investigator for Richland Parish Sheriffs Office, testified that he interviewed the defendant on November 1, 2000. After reading the defendant his Miranda rights, the defendant initially denied any involvement in the armed robbery. The defendant later told Robinson that if “he [Robinson] could get him [the defendant] ten years, he’d [the defendant] tell him [Robinson] what happened.” Robinson responded that he couldn’t offer him ten years, but he would contact the district attorney to see what sentencing options were available. While they were taking a break from the interview, Robinson testified that the defendant “began to cry, and he [the defendant] told me, mister, I only fired one shot.”
Dr. Steven Timothy Hayne, a physician practicing in the fields of anatomic pathology, forensic pathology and clinical pathology, was qualified as an expert in the field of forensic pathology. He testified that the victim died of injuries sustained from a single gunshot wound to the chest.
Detective Todd Cummings of the Louisiana State Police, Criminal Investigation Division, testified that in June 2002, he was assigned to investigate the victim’s death as a cold case. In March 2009, he received a crime lab report from the state police crime lab indicating that the defendant had been identified as the contributor of DNA found on a sweatshirt. Cummings stated that the defendant’s three confessions to Thompson, Branch, and Robinson, the crime lab reports regarding the DNA, and the supporting witnesses that placed the defendant in the area at the time the crime was committed, led him to arrest the defendant for the victim’s murder.
1 flNeah Horath testified that on October 10, 2000, he was employed at the East Carroll Sheriffs Department as an evidence custodian and investigator. He collected evidence and photographed the *535 crime scene and surrounding area for the robbery and murder that occurred at Sonic. His photographs were admitted into evidence, and included pictures of two shell casings found at the crime scene, a 9mm handgun belonging to the victim, the mask Officer Willis located in “the trees,” the black sweatshirt discovered by Officer Willis, and the bullet found in the victim’s chest.
On March 22, 2013, the jury found the defendant guilty as charged of second degree murder. On May 20, 2013, the defendant filed a motion for a new trial, alleging that the jury was intimidated by the victim’s family. The trial court denied the motion, and subsequently conducted a sentencing hearing. After considering the information contained in the presentence investigation report, the trial court concluded that the defendant was in need of correctional treatment, that a lesser sentence would deprecate the seriousness of the crime, and that he was likely to re-offend. It sentenced the defendant to mandatory life imprisonment without the benefit of probation, parole, or suspension of sentence.
The defendant filed the instant appeal.
LAW AND DISCUSSION

Sufficiency of the Evidence

In the defendant’s first assignment of error, he argues that the evidence was insufficient to support his conviction for second degree murder. Specifically, the defendant argues that the state failed to prove that he was the person who robbed the Sonic restaurant and shot the victim.
| inWhen issues are raised on appeal, both as to the sufficiency of evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the. crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833. On appeal, a reviewing court must view the evidence in the light most favorable to the state and must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. Jackson, supra.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
|nThe Jackson standard is applicable in cases involving both direct and circumstantial evidence. Direct evidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts *536 and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by the evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299. This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. Id. Rather, all of the evidence, both direct and circumstantial, must be sufficient under Jackson to convince a rational juror that the defendant is guilty beyond a reasonable doubt. Id.
 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert., denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal | ^contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Eason, supra; State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490.
In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Lewis, 43,402 (La.App.2d Cir.8/13/08), 990 So.2d 109. A tentative identification is not necessarily unreliable. Id. Positive identification by only one witness may be sufficient to support a defendant’s conviction. State v. Davis, 27,961 (La.App.2d Cir.4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12; State v. Miller, 561 So.2d 892 (La.App. 2d Cir.1990), writ denied, 566 So.2d 983 (La.1990). A victim’s or eyewitness’s testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility choices of the trier of fact beyond the constitutional standard of sufficiency. State v. Davis, 2002-1043 (La.6/27/03), 848 So.2d 557; State v. Ponsell, supra. Testimony by a jailhouse informant is a credibility determination made by the jury. *537 State v. Robinson, 2002-1869 (La.4/14/04), 874 So.2d 66.
La. R.S. 14:30.1 provides:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juvenile, or terrorism, even though he has no intent to kill or to inflict great bodily harm. (Emphasis added.)
La. R.S. 14:64(A) states:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
The defendant contends that there is no direct evidence linking him to the crime. He further contends that no witnesses identified him as the suspect, nor did anyone place him at the crime scene.
114As stated in the facts section of this opinion, Sonic employee Brenda Thomas testified that a man dressed in a black mask, shirt, and mask approached them, brandishing a handgun. Sonic employee Mia Tyler testified that the suspect was wearing all black and had a handgun in his possession. Thomas and Tyler heard the suspect demand the deposit bag from the victim. Tyler saw the suspect shoot the victim and flee with the deposit bag. Further, Dr. Hayne testified that the victim died of injuries sustained from a single gunshot wound to the chest, and expert witness Jeff Goudeau testified that the bullet which struck the victim was not fired from his own handgun. These testimonies sufficiently establish that the victim was killed during the perpetration of an armed robbery, which are necessary elements for a conviction of second degree murder.
The testimony presented at trial placed the defendant near the scene of the crime at the time the armed robbery took place. Thompson testified that the Sonic restaurant closed at 10:00 p.m., and that she, Tyler, and the victim remained at the Sonic restaurant for another hour to clean the restaurant. When they walked out of the restaurant and were subsequently robbed, it was approximately 11:00 p.m.
Officers Willis and Lee were able to follow the suspect’s route with the help of eyewitnesses. Officer Willis was able to recover a black cap/winter mask and sweatshirt along the route to Uncle Darryl’s. The sweatshirt is the same sweatshirt that Julia Nailer extracted DNA evidence from, and after testing the evidence, could not exclude the defendant as a possible contributor. Officer Willis described the walk from Sonic to Darryl’s Mini Mart as a walk that takes about five minutes.
11sTerrance Baker, the cashier at Uncle Darryl’s Mini Market, testified that the defendant came by the store at approximately 11:00 p.m. He also stated that the defendant was only wearing a tank top.
Chief Investigator Willie Robinson testified that the defendant tearfully informed him that he “only fired one shot.” Further, the defendant’s former best friend, James Branch, and his former cell mate, James Thompson, both testified that the defendant admitted to committing this armed robbery.
*538 From the totality of the evidence presented, the jury could have concluded beyond a reasonable doubt that the defendant was guilty of second degree murder. This evidence overwhelmingly establishes the defendant’s identity as the person who committed the second degree murder of the victim while perpetrating this armed robbery. Therefore, this assignment is without merit.

Denial of Motion for New Trial

In the defendant’s second assignment of error, he argues that the trial court erred in denying his motion for new trial. He argues that the jury’s verdict cannot be relied upon as being based entirely upon the evidence and not on factors extrinsic to the trial, since members of the jury believed the victim’s family was taking pictures of them on the last day of trial. The trial court ruled that the act of the victim’s family taking photographs of each other was not “such that would be a presumptive prejudicial act.” We agree.
The decision on a motion for new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear showing of abuse. State v. McLemore, 26,106 (La.6/24/94), 640 So.2d 847, writ denied, 94-1908 (La.12/9/94), 647 So.2d 1107, cert denied, 514 U.S. 1116, 115 S.Ct. 1974, 131 L.Ed.2d 863 (1995).
Initially, in any trial, there is a presumption of jury impartiality prejudice will not be presumed, but can be demonstrated by a defendant by a preponderance of credible evidence. U.S. v. Winkle, 587 F.2d 705 (5th Cir.), cert. denied, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). However, any unauthorized communication, contact, or tampering directly or indirectly, made by a nonjuror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with the rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. The presumption is not conclusive, but the burden rests heavily upon the state to establish, after notice to and hearing of the defendant, that such contract with the juror was harmless to the defendant. Winkle, supra. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury’s deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the state to show that the influence demonstrated was not prejudicial. State v. Sinegal, 393 So.2d 684 (La.1981); McLemore, supra.
Essentially, an impermissible “outside influence” is an unauthorized communication or overt act by a third party which creates an extraneous influence on the jury. However, even if such acts occur they are subject to harmless error analysis. State v. Sanders, 33,778 (La.App.2d Cir.10/4/00), 769 So.2d 183; Sinegal, supra. Proper analysis for determining harmless error is whether the jury’s guilty verdict actually rendered in the 1 ^particular case was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); State v. Small, 37,134 (La.App.2d Cir.6/27/03), 850 So.2d 1019.
In this case, as Deputy Mondario Han-ford escorted the jury to lunch, he testified that he immediately noticed the victim’s family already seated in the restaurant. After receiving confirmation from his supervisor that the jury could enter the restaurant, he positioned himself so that he could observe both the jury and the victim’s family. Hanford testified that he did not see any contact transpire between the jury and the victim’s family, but he did *539 overhear a juror state that a member of the victim’s family took a picture of the jury.
Reginald Washington, a member of the victim’s family, testified that he took a photograph of his uncle, whom he had not seen in over a year, and his mother. Washington expressed that he had no intent to take a picture of the jury and that he and his family members made a conscientious effort to comply with instructions to avoid contact with the jury. In fact, when asked, Washington noted that he would have had to angle his camera differently in order to take a picture of the jury.
Reginald Washington’s act of taking a photograph of two of his family members did not create an extraneous influence on the jury. No evidence was presented to prove that a photograph was actually taken of the jury. We conclude that the act of taking a photograph of a family member in the presence of the jury does not constitute the establishment of contact or communication. Moreover, even if this communication was impermissible, |isit constituted only harmless error. See Sanders, supra. The assignment of error lacks merit.
CONCLUSION
For the reasons stated, we hereby affirm the defendant’s conviction and sentence.
AFFIRMED.