# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 17-684

**STATE OF LOUISIANA**

**VERSUS**

**BILLY DEAN COTTEN**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 323,137
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and D. Kent Savoie, Judges.

**AFFIRMED AND REMANDED.**

**J. Phillip Terrell, Jr., District Attorney**
**Catherine L. Davidson, Assistant District Attorney**
**Ninth Judicial District Court, Parish of Rapides**
**P.O. Drawer 1472**
**Alexandria, LA  71309**
**(318) 473-6650**
**COUNSEL FOR STATE/APPELLEE:**
　　**State of Louisiana**

**Mary Constance Hanes**
**Louisiana Appellate Project**
**P.O. Box 4015**
**New Orleans, LA 70178-4015**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
　　**Billy Dean Cotten**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

On March 6, 2014, nine-month-old Aiden Dyson was left by his mother in the care of his step-father, Defendant, Billy Dean Cotten, while she went to work. Several hours later, the victim was taken to the hospital suffering from life threatening injuries requiring him to be placed on life support. The following day, after it was determined that Aiden had no brain activity, he was removed from life support.

After an investigation by the authorities, Defendant was jointly charged with his wife, Darlene Michelle Cotten, by bill of indictment with the March 6, 2014, second degree murder of Defendant's step-son, Aiden Dyson. A jury unanimously convicted Defendant of the charged offense, and the court subsequently imposed a mandatory life sentence at hard labor without the benefit of parole, probation, or suspension of sentence. From this conviction and sentence, Defendant appeals.

## ANALYSIS

**Assignment of Error One**

In his first assignment of error, Defendant contends the State presented insufficient evidence to support his conviction of second degree murder in that it failed to exclude the reasonable hypothesis that the death was caused accidentally and unintentionally.

Louisiana Revised Statutes 14:30.1 states in pertinent part:

A. Second degree murder is the killing of a human being:

. . . .

    (2) When the offender is engaged in the perpetration or attempted perpetration of . . . cruelty to juveniles, second degree cruelty to juveniles, . . . even though he has no intent to kill or to inflict great bodily harm.

Cruelty to juveniles is defined in pertinent part as:

2

(1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense[.]

La.R.S. 14:93.

Second degree cruelty to juveniles is defined in pertinent part as follows:

A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

La.R.S. 14:93.2.3.

In *State v. Jackson*, 15-393 (La.App. 3 Cir. 11/4/15), 179 So.3d 753, 767-69, *writ denied,* 15-2191 (La. 5/2/16), 206 So.3d 877, this court reviewed the sufficiency of the circumstantial evidence presented in a second degree murder case which was based on cruelty to a juvenile. In doing so, this court stated:

In *State v. Taylor*, 14-432, pp. 7-8 (La.3/17/15), 166 So.3d 988, 993-94 (emphasis added), the court explained in pertinent part:

The rational trier of fact standard established by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), preserves "'the factfinder's role as weigher of the evidence,'" by requiring an appellate court to review "'*all of the evidence* . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown*, 558 U.S. 120, 134, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781). Preserving the role of the factfinder means that in cases involving circumstantial evidence, when "the jury reasonably rejects the hypothesis of innocence presented by the defendant [ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984). The alternative hypothesis is not one that merely "*could* explain the events in an exculpatory fashion," but one that, after viewing all of the evidence in a light most favorable to the prosecution, admissible as well as inadmissible, "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond

3

a reasonable doubt.'" *Captville*, 448 So.2d at 680 (quoting *Jackson* ); *see State v. Hearold*, 603 So.2d 731, 734 (La.1992) ("[W]hen the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial."). . . .

. . . .

. . . . This court has stated the following regarding circumstantial evidence:

> [W]hen the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright*, 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. . . . On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.

*State v. Dotson*, 04-1414, p. 2 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, 312. Additionally, when a jury "'reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'" *State v. Strother*, 09-2357, p. 11 (La.10/22/10), 49 So.3d 372, 378 (quoting *State v. Captville*, 448 So.2d 676, 680 (La.1984)).

Id. at 767-69.

At trial, Doug Alford, a detective with the Alexandria Police Department, testified that on March 6, 2014, he investigated a call concerning the incident at issue in this case. He proceeded to the emergency room where he observed the victim intubated and non-responsive. From there, he went to the police station to interview Defendant. After advising Defendant of his rights and securing a waiver thereof, Detective Alford took a statement from Defendant wherein he detailed the events that transpired on the day of the incident:

4

A. He said that his wife had left somewhere around ten, ten thirty in that time frame that morning. He had laid the baby down, Aiden, down for a nap. He said the baby slept till about twelve forty-five, somewhere in that time frame. He wasn't real sure on the time. He woke the baby up, fed the baby, gave him his medicine, put him back to sleep. About forty-five minutes later, he heard the baby crying. He goes in there, picks the baby up and the baby started seizing. He said that the baby went limp. He called 911. Originally, he said he went into the living room and started CPR. Later in his statement he said that he actually went downstairs to an apartment a maintenance guy had opened up that was empty for them to go in. He started CPR there and also called 911 from there. During that time frame, he also made a call to Darlene, the mother, and I believe to his mother, but I'm not certain on that.

. . . .

A. He did say that the baby was breathing but he was doing CPR. That was in his statement. He said that the mother made – got back. She works at the Alexandria Mall. She worked at the cookie – Great American Cookie. She got back prior to the ambulance leaving and she rode in the ambulance with the baby and he followed in a vehicle.

. . . .

A. He said that after we got back – he said that's when he got there and you know, the police escorted him back to the station. I then informed him of what the doctor had told me. And he said – and I told him that, you know, a test would show what the doctor told me. And he said, well, that's what it's going to show but that's not what happened. He then said that the baby had fell earlier in the day and bumped his head on the entertainment center by some DVDs and stuff where he was playing.

Q. Now when he said, that's what they say but that's not how it happened – did you ask him further about that?

A. No, he said, that's what it's going to show but that's not what happened. That was the quote on video. It's on video.

Q. Did he expound on that?

A. He just said that the baby had been playing earlier in the day by the entertainment center, had some DVDs and stuff – said that the baby was on its knees. He said that he just said, hey, and it startled the baby. The baby let go of the entertainment center, fell forward and bumped its head.

Detective Alford testified Defendant inconsistently reported when he called 911. First, he said he called while he was in the apartment, but he then said he was

downstairs.  He also reported in one statement that the victim was breathing but not conscious, but another time he said the victim was limp and not breathing.

According to Detective Alford, Defendant did not show any emotion during the interview except to get upset when Detective Cruz corrected him.  Defendant repeatedly said he did not do anything to the victim, and he did not say it was an accident.  Defendant also told Detective Alford that the victim had a seizure the prior October after he fell out of his stroller and bumped his head.  After that incident, the victim had a seizure in the emergency room, was admitted to the hospital, and after having another seizure, ended up in the ICU.

Prior to the incident at issue, in January of 2014, a police report was filed wherein Defendant stated during an argument between he and Mrs. Cotten, who was pregnant at the time, he pushed her down.

Mrs. Cotten was asked about the October 2013 incident during her testimony.  She said that while they were trick or treating, Aiden's car seat, which was not properly latched into his stroller, flipped over when Defendant hit a bump on the street.  The handle on the car seat was down, and because it was possible Aiden hit his head, they took him to the hospital.  He had a red mark on his forehead just above his left eye.

The following February, they took Aiden to the hospital because he could not keep food down.  After three days of being in the hospital, he suffered two seizures, said by doctors to be caused from a drop in his sodium levels because he had not eaten.[1]  During the second one, which was witnessed by Mrs. Cotten, Aiden's hands curled back, his back arched, his eyes rolled back, and he "went silent."  When asked if these things occurred in the ambulance on March 6, 2014,

_____

[1] Dr. James Hebert, whose testimony is discussed below, strongly disagreed with this finding.  He testified that the radiologist reviewed a CT scan done on Aiden a month prior and found evidence of a "subdural" that had not been identified as the initial reading was "normal." Dr. Hebert believed Aiden's sodium level was nearly normal and Dr. Hebert felt it would "maybe be the first time in history that anyone had a seizure with a sodium of that level."  Dr. Hebert said he could not link a sodium level of 130 with seizure activity.

Mrs. Cotten said he was strapped down on a bed, so she could not tell if his back was arching; however, he screamed that day unlike the previous episode in October. That day in March, she observed no marks on his head or bruises on his arms or legs; she could see no change from the way he appeared before she left for work.

A video of the victim taken four hours before he was taken to the hospital was shown by his mother to police. It was played for the jury. We reviewed the video and observed the nine-month-old victim crawling around on a bed while Defendant was sleeping. He was babbling, very active, and appeared to be happy.

Mrs. Cotten testified she was jointly charged with Defendant, her husband, for the second-degree murder of Aiden, who was not Defendant's biological son. Mrs. Cotten stated she was testifying on her own free will and nothing had been offered to her. According to Mrs. Cotten, Aiden suffered from acid reflux, seasonal allergies, eczema in the bends of his arms and legs, occasional cradle cap, but no other medical conditions. At the time of the incident, he was taking Claritin for his allergies, but no cough medicine. The morning of March 6, 2014, after feeding and dressing Aiden and getting ready for work, she woke Defendant so he could take care of Aiden. Between 8:30 and 9:00 a.m., Mrs. Cotten videoed Aiden and Defendant on the bed while Aiden attempted to wake Defendant.

About four hours after arriving at work, Mrs. Cotten received a phone call from Defendant that Aiden had been having seizures and she needed to leave work immediately to ride with him in the ambulance. During the ambulance ride, Mrs. Cotten observed Aiden screaming, then passing out, and waking up screaming. Emergency room personnel told her they would do everything they could, but that Defendant and Mrs. Cotten were to remain in a waiting area. Defendant, Mrs. Cotten, her mother, and their pastor waited for news of Aiden's condition. Before the doctors relayed any information, two policeman arrested Defendant. The

7

doctors then informed them that Aiden had suffered blunt force trauma to the brain which caused bleeding on the left side of his brain, rendering him "brain dead." Mrs. Cotten testified she spoke to Aiden's father, Dustin Dyson, and they agreed to remove him from life support. Mrs. Cotten testified she was "lost" and her "whole world was turned upside down." When she went down to ask Defendant what had happened, he told her, "he had no idea what happened, that he was just in his room sleeping – Aiden was – and he heard him crying and he went to go pick him up and he just started having a seizure. And, he told [her] he didn't know why." He said nothing about Aiden hitting his head on the entertainment center, and Mrs. Cotten had not seen Aiden bump his head on the entertainment center that morning. According to Mrs. Cotten, Aiden had started holding onto things and walking but was not "free walking" yet. When asked if he fell a lot, Mrs. Cotten replied that "he fell on his butt."

Dr. James Hebert, the emergency room physician who examined Aiden, was accepted by the court as an expert in emergency and trauma, with expertise in diagnosing blunt force trauma. Upon seeing Aiden, Dr. Hebert observed intermittent seizure activity, mottled skin, a slow heart rate (rare in children, and thus indicative of a significantly ill child), intermittent pauses in breathing, and posturing, which is a neurologic reflex indicative of significant head injury. An examination of his eyes showed retinal hemorrhages in both eyes. Aiden's eyes were "going in two different directions" when he arrived in the emergency room. Dr. Hebert testified of the approximately 40,000 patient encounters he has had in ten years, this was one of the most memorable. After doing the retinal examination, he instructed the nurse to contact child protective services and police because he suspected this was an abusive head trauma case. He explained:

> A. The presence of retinal hemorrhages is a statistically very significant finding. When there are bilateral and large massive areas of hemorrhage, statistically you'll find that that type of hemorrhage

only occurs in cases of abuse. You will see retinal hemorrhages with accidental trauma. But post-mortem studies, retrospective analysis studies published by the American Journal of Opthamology [sic] in – Pediatric Opthamology [sic] and Strabismus in 2009 – found that in all cases of accidental trauma where it was a known accident, there were minimal to no retinal hemorrhage. In the cases where it was known to be an inflicted injury or an abusive injury, a significant occurrence, almost half of these patients had retinal hemorrhages. And every patient in the study that had severe bilateral hemorrhages were victims of abuse. And that was corroborated by a 2006 by the American Academy of Opthamology [sic] that postmortem autopsy reviews found that as increasing severity of hemorrhage involving both eyes, involving the optic sheath, the incidents that it was caused by abuse and non-accidental trauma was a significant correlation there. You really just don't see bilateral hemorrhages or severe hemorrhages outside of inflicted or abusive head trauma.

Dr. Hebert testified he observed no other injuries on Aiden's body. According to Dr. Hebert, a study performed in Canada and reported in the Canadian Medial Association Journal, revealed half of the infant victims of abuse showed no signs of trauma. Dr. Hebert more fully explained the cause of retinal hemorrhaging:

A. The cause of retinal hemorrhaging typically overwhelmingly is trauma. Like I said, it's - accidental trauma can cause small retinal hemorrhages. But it's really - it has to do with the sheer stress of an acceleration, deceleration type injury; whether it's a blunt trauma, like a car accident, or a significant fall down a flight of stairs. Or in the case of abusive head trauma, the shaking back and forth. The term Shaken Baby Syndrome is commonly used. It's an older term. It's easy to identify and understand. Shaking - everyone knows what shaking means. And so they haven't shied away from that term as far as like public service goes and education to new parents. But medically in 2009, we kind of moved away from that. American Academy of Pediatrics embraced a broader term of abusive head trauma. But it contains that umbrella of Shaken Baby Syndrome also called Infant Whiplash Syndrome. Basically, children, infants particularly, their head is disproportionate to their body. And their neck muscles haven't had a chance to develop to provide the support of their brain and head that would be eventually developed. And so a violent shaking will cause their head, you know, significant [sic] to move back and forth. And then what can occur at that time, the brain essentially sloshes around inside the skull; kind of bangs back and forth inside the skull. And blood flow to the brain, it enters through the carotid arteries and the vertebral artery through the basal artery and then kind of branches off into the various arteries that surround

9

the brain. But it all exits pretty much the same way through these bridging veins that go to these sinus tracks along the skull and then down into the jugulars and back to the heart. And so what happens unfortunately is with the sheer trauma and forward and back, forward and back the brain is jerking back and forth and these bridging veins can tear. And so you'll get a hemorrhage inside the skull. And that is one of the biggest problems for these children is the brain injury. You can certainly see blindness from the result of the retinal hemorrhages but it's the brain injury that oftentimes results in the ultimate, you know, morbidity and mortality. But the same concept in the eyes with the violent shaking back and forth, basically at adhesion points where the macula attaches to the retina. That's basically the part of your eye that does most of the seeing, most of the focusing on the retina where the vitreous, which is the goo inside your eye basically where it attaches to the retina. And at these points you'll see that shearing. And I guess the simplest way to describe it, it's I guess gruesome, but you kind of literally shake the eyes apart on the inside.

Dr. Hebert was asked, if Aiden had fallen and hit his head on the entertainment center, whether this type of injury could have occurred. He responded:

A. A subdural hematoma in the brain and bilateral retinal hemorrhages could not occur from a minor trauma. A study done by Children's Hospital at Kansas City, Missouri published in 1999 where they reviewed a lot of pediatric accidental falls – none of these were abusive. These were all accidental falls, four feet. They found eighty-five percent of the children in the study had no injury. They had I think seven percent had linear skull fracture from the fall. And two percent or two patients in the study had a hemorrhage. And it was later proven that those were both victims of abuse. And so in this study, where they retrospectively evaluated these patients, they found with four foot falls – not a baby falling forward and bumping his head on a table – they found no evidence of trauma – of bleeding at all; much less significant retinal hemorrhage and subdural hematoma.

Dr. Hebert also explained the difference in intentional injuries and accidental injuries:

A. Intentional verus [sic] accidental meaning the injury is occurred as the result of someone actively harming the child as opposed to, you know, a car accident or accidentally dropping down a flight of stairs. Just meaning the child is the focus of the injury as opposed to just anything happening. You know, the child falling or something falling on the kid or getting in a car accident; things like that.

When Dr. Hebert was asked if Aiden's injury was intentional or accidental, he responded:

A. The history I was given of having been fed a bottle and then put down in the bed and then found this way later, is completely incongruent with what we identified on exam. It is – based on the statistical analysis of multiple cases and – the term evidence-based medicine came about in the early two thousands. And basically it's when, as physicians, we moved away from just kind of going by our anecdotal experience on how to treat things and started looking at large cohorts of patients where they would study thousands of patients in some cases and see what effect medications had on them and turns out, like this medicine doesn't actually help high blood pressure so we stopped using it. And, this medicine is very effective. And the concept of aspirin for a heart attack proven to save lives, that's an example of evidence based medicine being put into practice. So based on, you know, the evidence that's out there, statically [sic] you look at other human beings. And the only patients in any study that had severe hematoma associated with bilateral massive retinal hemorrhage in any of these studies, without exception, they were from abusive head trauma or intentional trauma.

Dr. Hebert testified that a fall from a stroller in October could not have been the cause of the subdural hemorrhaging and the "bilateral retina" as resolution of an intracranial bleed would occur within about a month. He testified that shaking the baby would have caused immediate symptoms. The posturing, seizing, and intermittent stopping of breathing that he had upon arrival could have taken some time, but "overwhelmingly symptoms are present immediately."

Dr. Hebert testified he spoke to the family and explained why police had to be called. Aiden was transported to the Pediatric Intensive Care Unit from the emergency room, and life support was withdrawn the following day. Dr. Hebert was asked whether he felt this injury was intentional, and he replied, "[u]nder oath in a court of law with a man's future at stake, unequivocally I felt absolutely that this was an inflicted injury."

Dr. Marvin Mata, the pediatric ICU specialist that was consulted in Aiden's case, testified that the CT scan showed Aiden had a subdural hematoma (subdural bleed) on the right side, but there was also evidence of bleeding on the left side of

the brain which had resolved. Blood was pooling between both sides of the brain, and there was bilateral severe retinal hemorrhaging, which is typically associated with non-accidental trauma, abusive head injury. He explained that abusive head trauma "consists of acceleration/deceleration forces that effects [sic] the brain of the child. It causes tearing to the deep layers in the eye that causes the bilateral severe hemorrhages. It cases brain injury at the cellular level and so the brain is not able to sustain its function and is not able to support the other organs in the body as well." Dr. Mata explained that acceleration/deceleration forces involve rapid forward and backward or side-to-side movement of a child and can be part of Shaken Baby Syndrome, a term used in the past. Dr. Mata, like Dr. Hebert, testified that in about half of patients with abusive head injuries no external injuries are observed. Dr. Mata testified that a seizure would not cause this abusive head trauma and neither would a fall against the entertainment center, which would cause a more focal injury where the head was bumped. Dr. Mata testified that the true indicative sign of abusive head trauma is the presence of severe bilateral hemorrhages. Dr. Mata confirmed on cross-examination that an acceleration/deceleration force could be caused by the head hitting something, rebounding, and hitting something else.

When it was ultimately determined that Aiden had no brain activity, Dr. Mata spoke with the family who opted to withdraw life support. Dr. Mata testified on redirect examination that a nine-month-old child was not capable of producing the type of injuries Aiden had and based on the findings from the physical exam and the neuro-imaging, Aiden's injuries were consistent with being non-accidental.

Dr. Christopher Tape, the pathologist who performed the autopsy of Aiden, was accepted by the court as an expert in the field of forensic pathology. His findings were that Aiden suffered subdural hemorrhaging due to blunt force injuries and the manner of death was homicide. He arrived at this conclusion due

to an asymmetrical brain injury pushing the brain to one side and subdural hemorrhaging around the spinal cord in the back. He explained:

> It's pushing the brain to one side. So that says it's not a natural cause of a bleed, 'cause if you had a natural cause of this bleed, it would just be kind of everywhere. So I'm sort of left with – I have a nine month old that is probably not very mobile and is probably not having these injuries on its own too much, and I don't have a better explanation for this injury. So I sort of [by] default go to homicide. And again, there's two injuries here in two separate areas. They're not likely explained by a fall. A fall that's going to kill you, you are probably going to see some injuries on the head, on the scalp, maybe broken bone, and there was none of that. So it's not a big fall, like an accident. And so I am again – so I'm left with homicide as a default.

Dr. Tape confirmed that the injuries could not have been caused by a seizure and the blunt force injuries could be indicative of abusive head trauma. When asked if the retinal hemorrhaging was indicative of abusive head trauma, Dr. Tape replied, "Not necessarily. Not in my opinion." He explained:

> A. This is a controversial area. My opinion, the retinal hemorrhages, the optic nerve sheath hemorrhages are actually due to increased intracranial pressure; which means just pressure inside the brain and it's kind of pressing, and it causes this bleed. Now, unfortunately, this is an area where we don't have very good scientific studies because we can't do this study. It would be unethical to do this study where you do this to infants.

> Q. But the subdural hemorrhaging would have been a bi-product of the retina hemorrhaging?

> A. The other way around. The retinal hemorrhages is a bi-product of the subdural hemorrhage.

Dr. Tape testified that any type of impact or acceleration/deceleration injury is a blunt force injury which can be created by whiplash action. A nine-month-old baby's neck is not mobile enough to stop the back and forth or side-to-side action.

On cross-examination, Dr. Tape testified that a nine-month-old pulling up and falling forward and hitting a cabinet or falling backwards would not cause the injuries Aiden sustained. Dr. Tape testified that in the vast majority of shaken baby cases, the baby has not been shaken but more likely made impact with a soft surface where there is an acceleration/deceleration impact. Because it is a soft

13

surface and babies have pliable bones, no injuries are seen but the acceleration/deceleration impact is there. Dr. Tape also discovered a spinal cord injury in Aiden's mid-back, which he believed was a separate injury from the brain injury. He explained that the spinal cord injury was probably an acceleration/deceleration injury which could have been caused by shaking, a blow to the back, or a high fall from at least five or six feet.

As for the manner of death being homicide, Dr. Tape explained that homicide for his use is a medical legal definition that is one person causing the death of another. A case of self-defense or a case where someone shoots a person while hunting thinking they are shooting a deer are both still homicides because the person intended to kill their target. Dr. Tape testified that he could not absolutely rule out an accidental death in this case. However, on redirect examination, Dr. Tape confirmed that a nine-month-old child cannot throw himself up against anything and even if he fell backwards in his crib, it would not cause subdural hemorrhaging.

Jordan May, who lived with Defendant and Mrs. Cotten briefly four years prior to trial, testified that during the time she stayed there, she was at home during the day with Mrs. Cotten and Aiden. When Ms. May moved in, Aiden was approximately two or three months old, and he was about five or six months old when she left. During the time she lived there, Ms. May witnessed Defendant and Mrs. Cotten arguing. During one particularly bad argument, Defendant was angry because Mrs. Cotten was giving too much attention to Aiden, who suffered from numerous health issues. On that particular day, Mrs. Cotten had been caring for Aiden all day and Defendant wanted her attention which he was not getting.

Jerry Guin, who served time in jail for second degree battery, testified that he was housed in the same cell with Defendant for a period of time. Defendant told Guin that "an accident occurred. . . . he had a bad accident. He did something he

14

wished he wouldn't have done. Went a little bit too far." Guin testified that he contacted police because he felt like it was the right thing to do. When asked to explain what he meant by going a little bit too far, Guin said he told police:

> Just by shaking the baby and shaking it – you know, I mean he shouldn't have shook it. You know, and basically because – you know, being a stepfather, you know, you can picture a time when kids would make you feel like you should do something to them wrongfully. You know, because they're not yours. And, that's just the way – that's the persona that I took then, you know, coming from him. And, that's why I reached out to y'all. I mean, Aiden he couldn't come back and reach out to him. Someone had to.

According to Guin, Defendant said he shook the baby because his wife did not get home in time and he was babysitting. He said he shook the baby to get him to "shut up." Guin testified Defendant also talked to him about jealousy issues:

> We was just talking about any normal stepdad that looks at a kid that ain't theirs. You know, a man can't take that disease out of him knowing that that ain't his kid to where he don't want to do things for him or her that he would do for his own. You know, that's because in your mind you're usually thinking that their daddy should be doing it or you know, if my old lady didn't have a kid with him, I wouldn't have to be doing this.

Guin responded affirmatively when he was asked if he took this as "jealousy type anger." According to Guin, Defendant told him, the "little son of a bitch cried too much." Guin also testified Defendant told him the following about the incident:

> A. That he just – you know, I mean it wasn't – I don't think it started out to be a crime. Then it turned into one, you know. It went from there. He didn't mean to do what he meant to do. You know, I don't think no man could every intentionally kill a baby at the moment in time. You know, no matter how old the baby is. But when you go overboard, you go overboard. Basically, that's what has come about. The man went overboard, you know. What bits and pieces I've picked up along the way, you know, he could have stopped a long time ago. He could have left the woman or become better friends with the father's baby and got the father's baby to spend more time with him.

Guin was asked if Defendant ever told him that the baby fell. Guin testified Defendant told him about another incident where he kicked the stroller too hard

and it fell over with the Aiden in it. Guin was asked whether Defendant ever said that the baby fell during the times he had the baby. Guin responded, "I can't recall. I mean, it's vague to me. You know, maybe too many marijuana sticks. I don't know."

Guin was shown his statement given two years prior to refresh his memory about an incident where Defendant wrapped Aiden in blankets. Guin then said:

A. He said he, you know, wrapped it up and then held it, you know, and just – I can't remember much about the blanket situation. I ain't going to – I can't sit here and lie to you and say I do, you know. I mean, I remember something about it but just – I don't remember the whole conversation about the blankets. So I mean –

Guin read from his prior statement in the following colloquy:

A. (reading) and that earlier she was with somebody else or she just wanted to stay away from – a little while longer because she was worried about him doing something. And he called her and she wouldn't answer the phone. The baby cried, cried, cried, cried and he said he wrapped the baby up in a blanket and started shaking him. He shut up for a little while and he said that I knew I couldn't smother him. He said that he just wrapped him up and he showed me the blanket. And he said that he just wrapped him up and shook him and shook him. And then he started thinking about some autopsy or something so he started shaking sideways. The little fucker quit crying.

Q. That's what he told you?

A. Yes, sir.

Q. Is that what you recall?

A. Yes, sir. In so many words. I think somebody got – now that's not basically what was said, you know, I mean like that. I mean, cause I couldn't have been able to stay in a cell with him then. You know what I'm saying?

Q. Okay.

A. So I mean, it wasn't that gruesome, crucial like that. I mean, I'm just being honest with you. I mean, it just – it wasn't – but it was something like that but it wasn't that gruesome.

        . . . .

A. (reading) after he said he shook him sideways and he quit crying, and what did he say happened. It just hurts me and I didn't want to – I

16

didn't want to sit here and listen to this bitch save that man – y'all should make sure the mother fucker don't get away with that. I'm telling you man that I – that no nine month old didn't do nothing. He just wanted to live. That's it. And sorry piece of shit like him and – taking care of him now for nothing.

. . . .

A. He said shut up. And then he called his wife and told her the baby had a seizure or something. She needed to hurry up and get home. He said that bitch started hauling ass home and then she got home and the baby was still. And they tried CPR on it something like that and tried to shake him back. Well, then they called the ambulance. The ambulance got there and they brought him to the hospital. Then he said once they got to the hospital that's when the doctors scared him. The doctor knew what he had done, he said, but there was no way he could prove it. And he could prove it now because the baby shake bake or something they called it. Baby shake syndrome or something.

Q. Okay. So he's telling you all this?

A. Yes, sir.

Q. What was going on through your mind when you're receiving all this information?

A. How can there be someone in this world like this? Basically. It sums it up in short. I mean, a lot of words don't need to be said in the courtroom. It's got a lot of women in here.

Q. Did he ever tell you that he thought – and you just kind of answered it but I'm going to kind of elaborate on it – that he thought he was going to get away with this?

A. Basically it was a fifty-fifty chance but he was leaving more towards the fifty-one percent, being his.

Q. Did he tell you why?

A. No, sir. That's just – I told you before, I mean, a lot has happened since then, Your Honor. You know, I mean a lot of it's vague to me.

Q. Did he tell you anything about what the doctor said to him?

A. I can't recall, brother.

Q. Okay. I'm going to draw your attention to page six. Question – but he said that the doctor – I'm going to let you start after that question.

A. He said that it looks like a homicide. When the doctor said that he said he knew one thing come out because they didn't have shit on him. And right there I knew right then that whenever they got

17

interviewed that all whatever – they come out of the interview room standing across from each other. He had their heads down and she looked up and said, what did you do to my baby? And he told her, I did nothing. What do you – our baby – he said, I ain't do nothing to our baby. That was your baby.

Q. Alright. And continue on.

A. He said right then that he knew the bitch was going to turn state['s] evidence on him. What you mean by that? He say I think I may have let it slip a couple times that what I did to him on the way to the hospital but she was so hysterical she didn't realize that. Okay. I'm sorry. When did they say anything about being interviewed by the police? Just a little – not so much the details – that whoever interviewed him is a rookie or something. But he didn't know what questions to ask and that even though – could put him on the stand and turn him upside down he said ain't going to have a chance because I'm firing him to a lawyer on the way for him because – and her lawyer . . . couldn't be in the same lawyers office and have him conflict something I told him. . . .

. . . .

A. Well, he's like well, I know that the bitch is going to turn state['s] evidence on me because they dropped her bond from a million dollars and put her on house arrest. I told they [sic] just know she didn't have nothing to do with it. She was at work. You killed her son. He say, it was an accident. I was just trying to get the little fucker to shut up where she wouldn't hear him crying in the background think I'm doing something wrong to him.

Q. And I've got to ask you this question. When you say – I don't like to use the term – the little f – er. Okay. I'm not going to say that. Is that your words or was that his words? [sic]

A. It was his words.

Q. He was that cocky? That confident?

A. Yes, sir. Yes, sir.

Q. Why are you here today?

A. I really and truly don't know, brother. It's just something – felt like the right thing to do. I don't know. I don't believe in no other spirits and the God above me, you know. You ask for blessings and you receive them. You know. And since then I've asked for a lot of blessings to see a different side of being here today, you know. And I didn't receive no other blessings than to be here. And it's easier for Aiden or for Cotten's case, I don't know. I'm just telling you what I feel in my heart and mind, you know. And it's not influenced by anyone or no substance. It's just influenced that I feel in my body, you know. I mean, I can't explain it no other way than that. . . .

Q. Are you facing any charges right now?

A. No. I ain't got nothing on me. Nothing. I ain't got no charges. I might have after this. But, I mean, I ain't got none on me as of right now.

. . . .

Q. And what did I tell you to tell?

A. The truth. That's what I told. I won't lie to you. I don't know you from Adam.

Guin affirmed that no promises had been made to him by the State in exchange for his testimony.

On cross-examination, Guin was questioned about the veracity of his testimony that Mrs. Cotten asked Defendant what he did to her baby when they exited the interview rooms. Defense counsel referenced Mrs. Cotton's testimony that Defendant was taken to the police station while she remained at the hospital, and also Detective Alford's testimony that the two were not interviewed at the same time. Guin responded that he did not know.

Guin stated on cross-examination that he also testified in a similar case to this one and did not receive anything for his testimony. His extensive criminal history was discussed including simple criminal damage to property, trespass, two counts of theft, domestic abuse/battery, simple burglary, possession of hydrocodone, possession of marijuana, identity theft, filing false public records. Guin admitted his memory is not very good due to his extensive marijuana use. On redirect examination, Guin confirmed that Defendant told him he shook Aiden, and "it was an accident and the baby died."

As stated above, Defendant contends the State failed to exclude the very reasonable hypothesis that if Defendant injured Aiden it was unintentionally done by accident and with Defendant not realizing what he had done. Defendant argues that Guin's testimony was bizarre and inconsistent with the testimony of other

witnesses.  He points to Guin's testimony that Defendant told him he shook the baby to shut him up because his wife did not return home on time "that night," as inconsistent with testimony she was at work that afternoon and not expected home. Additionally, Guin admitted he could not recall whether Defendant said Aiden fell before he died because maybe he had too many "marijuana sticks." Finally, Defendant notes Guin reported that Defendant told him he kicked the baby's stroller in the prior incident, whereas Mrs. Cotten said the 2013 incident was caused when Defendant hit a bump with the stroller.  This resulted in unreliable testimony asserts Defendant.  However, "[t]estimony by a jailhouse informant is a credibility determination made by the jury."  *State v. Bowman*, 48,797, p. 13 (La.App. 2 Cir. 4/23/14), 139 So.3d 529, 536, *writ denied,* 14-1136 (La. 4/2/15), 162 So.3d 394.

Applying the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), we find the evidence presented at trial established that Defendant was the only person present when Aiden's injury resulting in his death occurred and that it was not an accidental injury.  The medical evidence and testimony was consistent that Aiden suffered an abusive head injury that caused his death.  The medical testimony was unequivocal that this head injury could not have been caused by any typical fall or bump Aiden may have sustained.  After reviewing all the evidence in a light most favorable to the prosecution, we find a rational juror could have found proof of Defendant's guilt beyond a reasonable doubt.  Accordingly, we find this assignment of error has no merit.

**Assignments of Error Two and Three**

Defendant notes that, although his counsel argued that a life sentence was grossly out of proportion to the severity of the crime and requested a forty-year sentence, the trial court rejected the argument finding no factors to warrant a deviation from the mandatory life sentence.  In his second assignment of error,

Defendant claims his trial counsel was ineffective in failing to properly investigate his background and circumstances which would establish that he is exceptional and deserved a downward departure from a mandatory life sentence. Defendant contends counsel failed to argue that he suffers from Post-Traumatic Stress Disorder, ("PTSD") and that his occupation as a corrections officer is one of the most high-stress occupations in existence.

In his third assignment of error, Defendant contends the trial court erred in failing to consider the merits of his pro se motion to reconsider sentence on the basis that it lacked jurisdiction due to the granting of this appeal.

> The failure of a trial court to rule on a motion to reconsider sentence requires that the case be remanded for a ruling thereon, and that appellate review of a defendant's sentence be deferred. *State v. Augustine*, 2013-0164, p. 11 (La.App. 4 Cir. 12/4/2013), 131 So.3d 109, 116; *State v. Peters*, 2010-0326, p. 4 (La.App. 4 Cir. 2/16/11), 60 So.3d 672, 675. However, the failure to rule on a motion to reconsider sentence does not preclude review of the conviction. *Peters, supra*; *State v. Foster*, 2002-0256, p. 3 (La.App. 4 Cir. 9/11/02), 828 So.2d 72, 74.

*State v. Weathersby,* 13-258, p. 9 (La.App. 4 Cir. 4/16/14), 140 So.3d 260, 266.

The State, in brief, concedes that the trial court retained jurisdiction to consider Defendant's motion to reconsider sentence. Clearly, the denial of the motion was due to the trial court's belief that it no longer had jurisdiction to reconsider the sentence once the appeal was granted. Accordingly, we will affirm defendant's conviction and remand the case back to the trial court for consideration of Defendant's pro se motion to reconsider sentence. Defendant may raise his contention that his occupation as a corrections officer entitled him to a downward departure from a mandatory life sentence.

**DECREE**

For the foregoing reasons, Defendant's conviction is affirmed. We remand with instructions for a ruling on the motion to reconsider sentence.

**AFFIRMED AND REMANDED.**

21